In re WASHINGTON ASSOCIATES, Debtor.

266 WASHINGTON ASSOCIATES, and H.P.H. Development Co., Appellants,

v.

CITIBANK, N.A., Appellee.

CV 92–3027 (RJD).

United States District Court, E.D. New York.

Dec. 10, 1992.

Harvey Greenbaum, New York City, for appellant-debtor 266 Washington Associates.

Michael V. Blumenthal and Bruce J. Zabarauskas, Haythe & Curley, New York City, for appellant H.P.H. Development Co.

Stephen L. Ratner and Shalom Jacob, Rosenman & Colin, New York City, for appellee Citibank, N.A.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

This bankruptcy appeal involves a debtor whose single asset is a multifamily rental property and a lender with a multimillion dollar secured interest in that property. In pursuing its Chapter 11 petition, the debtor, 266 Washington Associates (the "Debtor" or "266 WA") proposed a "cramdown" plan of reorganization, hoping to retain possession and full control of the property. The secured creditor, appellee Citibank, N.A. ("Citibank") then moved for relief from the automatic stay provision of section 362(a) of the Bankruptcy Code (the "Code"). Over the Debtor's strong objections, Bankruptcy Judge Jerome Feller granted Citibank's motion, and rejected the Debtor's proposed plan of reorganization 141 B.R. 275. In addition, the lower court denied approval of the Debtor's First Amended Disclosure Statement (the "Disclosure Statement") and dismissed the Chapter 11 petition *sua sponte*. The Debtor and its investors, H.P.H. Development Co. ("HPH") (collectively the "Appellants") appeal Judge Feller's order.

For the reasons set forth below, the decision of the bankruptcy court is affirmed in its entirety.

### Factual Background

*Underlying Transaction*

The Debtor is a limited partnership owning a single asset, a 113 unit apartment building located at 266 Washington Street, in Brooklyn, New York (the "Property"). In June 1990, Citibank lent the Debtor $3.4 million dollars, at an interest rate of 10.68 percent, through a nonrecourse note secured by the Property. The debt was to be repaid in monthly installments of nearly $32,000 over a ten year period ending in July 2000.

In ten months, the Debtor defaulted on the loan, attributing its failure to a sudden deterioration of its financial condition, due largely to an unanticipated vacancy of twelve of the Property's 113 apartments.[1] On August 19, 1991, Citibank advised the Debtor that if its four month default were not paid by August 30th, it would face acceleration of the entire remaining sum. The Debtor failed to make any payment, despite having received nearly $500,000 in rent from the Property since January 1, 1991. Citibank then accelerated payment and commenced a foreclosure action in state court. In early September, the state

---

1. Because eight of the Property's apartments would normally be vacant, the difference was an occupancy rate of 89.2 percent rather than the expected 92.9 percent.

court appointed a receiver and enjoined 266 WA and its partners from collecting rent. One week later, on September 22, 1991, the Debtor filed its Chapter 11 petition, despite an occupancy rate of 96 percent.

*Bankruptcy Proceedings*

At the date of the petition, 266 WA owed Citibank, its only secured creditor, approximately $3.6 million, and its five trade creditors an aggregate of $26,800. The parties have stipulated that the value of the Property is in the range of $2.8 million to $3.1 million. This left the Debtor without equity in the Property and Citibank with an unsecured deficiency of $500,000 to $800,000 (depending on the Property's actual worth).

On November 11, 1991, Citibank moved for relief from the Code's automatic stay provision under section 362(d); hearings were to be conducted on January 22, February 6, and February 26, 1992. On January 22, the Debtor filed its first plan of reorganization (the "Original Plan"), proposing three classes of creditors: (i) Citibank's secured claim; (ii) the unsecured trade claims; and (iii) Citibank's unsecured deficiency claim. The Original Plan proposed to pay thirty percent on the bank's unsecured deficiency claim.

On February 6, 1991, just prior to the resumption of hearings on Citibank's motion, the Debtor filed an amended plan of reorganization (the "Amended Plan"), which divided the claims into three classes. Class 1 contained Citibank's total claim without distinguishing between its secured and unsecured components; the Amended Plan provided payment at a reduced rate of interest, and special amortization provisions, which could be deferred for the first twenty-four months after confirmation, should the Debtor's cash flow be insufficient. Class 2 consisted of the $26,800 in unsecured trade claims, to be paid in full over the first twelve months. Class 3 contained the equity interests of the Debtor's principals, proposing that they retain their

full equity interest in and control of the Property in exchange for new capital contributions.[2]

On June 5, 1992, Judge Feller filed a comprehensive, thirty-three page decision, granting Citibank's requested relief, and dismissing the petition *sua sponte.* He concluded that the Debtor's Plan(s) could not be confirmed "due to the Debtor's inability to obtain the requisite acceptances by at least one validly classified class of claims that is impaired," within the meaning of sections 1122, 1111(b), 1129(a)(10), and 1129(b)(1). June 5th Order, at 2. He accordingly declined to approve Debtor's Disclosure Statement, and dismissed the petition. *Id.* at 2–3.

266 WA and HPH appeal, contending that the Plan's classification scheme is valid under the Code and supported by policies underlying Chapter 11 which favor reorganization; they argue that because the statute should be construed to further its "rehabilitative" purposes, this Court should reverse and remand the matter for further proceedings to enable the Debtor to pursue reorganization.

Discussion

■ Under section 362(d), a court must relieve a party with an interest in secured property from the automatic stay provision if the debtor has no equity in the property, and "such property is not necessary to *an effective reorganization.*" 11 U.S.C. § 362(d) (emphasis added). Once the debtor's lack of equity in the collateral has been demonstrated, the burden shifts to the debtor to prove that the property is "necessary to an effective reorganization." *Id.*

■ The Supreme Court has interpreted this provision to require a debtor to prove, not just that the property is indispensable to its reorganization effort, but that

the property is essential for an effective reorganization that is in prospect. This means ... that there must be a *"reason-*

2. In a post-hearing brief, the Debtor proposed an additional amended plan (the "Proposed Second Amended Plan") which would include a class of unsecured claims consisting of only

Citibank's deficiency claim, should Citibank elect, under section 1111(b) to have its claim treated, not as fully secured, but as undersecured.

*able possibility of a successful reorganization* within a reasonable time".... *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (emphasis added). As a result of this "feasibility" test, if a debtor cannot establish that a reorganization can be achieved within a reasonable period, the court must grant an undersecured creditor relief from the stay. *See In re Outlook/Century Ltd.*, 127 B.R. 650, 652 (N.D.Cal.1991). Generally, in considering a section 362(d) application, courts have examined whether there exist any clear legal obstacles to a plan's confirmation. *See In re Northport Marina Assocs.*, 136 B.R. 903, 909 (Bankr. E.D.N.Y.1992); *In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 110 (Bankr.W.D.Tex.1987).

▪ Chapter 11 requires a debtor's plan of reorganization to properly classify the creditors' claims. Section 1122 provides that a plan must treat each class of creditors according to its members' priority status to ensure that claims of similar priority are treated similarly. 11 U.S.C. § 1122. Section 1129(a) provides that classes must separately vote whether to approve the plan. 11 U.S.C. § 1129(a)(8) and (10). A plan cannot be confirmed unless either (i) it is approved by two-thirds in amount and more than one-half in number of each impaired class, *see* 11 U.S.C. §§ 1126(c), 1129(a)(8); or (ii) at least one impaired class approves it, 11 U.S.C. § 1129(a)(10), *and* the debtor fulfills the cramdown requirements of section 1129(b). *See* 11 U.S.C. § 1129(a)(10), (b). The burden of proof rests squarely on the plan's proponent, in this case, the Debtor.

▪ The Debtor's Amended Plan classified Citibank's entire claim in a single class. However, a

debtor who is proposing a plan cannot on its own initiative make the section 1111(b)(2) election and place an undersecured creditor into a single secured class.

*In re Channel Realty Assocs. Ltd. Partnership*, 142 B.R. 597, 600 (Bankr.D.Mass. 1992). That election is statutorily restricted to the secured creditor. Therefore, to the extent that its claim is undersecured, Citibank is entitled to an unsecured claim for the deficiency. *See* 11 U.S.C. §§ 506(a) and 1111(b). Under the Proposed Second Amended Plan, Citibank would be the single secured creditor and one of two classes of unsecured creditors. Citibank's claim would clearly control the entire secured class; without separate classification, it would also control at least 95 percent of the unsecured class in any plan.

▪ The critical issue, then, turns on whether the Debtor can manipulate a cramdown by isolating, under section 1122(a), its unsecured trade claims as a class distinct from Citibank's unsecured deficiency claim simply to create a consenting class under section 1129(b).

Section 1122 provides for classification of claims in a reorganization as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

As Judge Feller observed and the parties agree, a number of courts have recognized that section 1122(a) does not, on its face, prohibit separate classification; rather, it bars only the placement of dissimilar claims in the same class. The Fifth Circuit, in the leading case, concluded that a broad interpretation of section 1122(a) would render subsection (b) superfluous, "a result that is anathema to elementary principles of statutory construction." *In re Greystone III Joint Venture*, 948 F.2d 134, 138–39 (5th Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). However, courts have not always agreed whether separate classification is ever permissible. One line of cases holds, as a general rule, a plan must place all "substantially similar" claims together. *See,*

*e.g., Granada Wines, Inc. v. New England Teamsters and Trucking Pension Fund,* 748 F.2d 42, 46 (1st Cir.1984); *In re Valrico Square Ltd. Partnership,* 113 B.R. 794, 795 (Bankr.S.D.Fla.1990).

Other authorities decline to adopt a categorical rule. *See, e.g., In re Jersey City Medical Ctr.,* 817 F.2d 1055, 1061 (3d Cir. 1987); *In re United States Truck Co.,* 800 F.2d 581, 585–86 (6th Cir.1986). However, even those courts read the section as incorporating at least some limits on separate classification of claims with similar priority. For example, the Sixth Circuit has observed, if a debtor's power to classify creditors under section 1122(a) were unrestrained,

> [t]he potential for abuse would be significant.... Unless there·is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*United States Truck Co.,* 800 F.2d at 586. The cases in this second line generally agree that any discretion available under section 1122(a) does not extend to manipulating the classification to gerrymander an affirmative vote on the plan of reorganization. For example, the *Greystone III* court has read section 1122 to permit classification of "substantially similar" claims in separate classes only if there exist "reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Greystone III,* 948 F.2d at 139; *see also In re Lumber Exchange Bldg. Ltd. Partnership,* 968 F.2d 647, 650 (8th Cir.1992); *In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990).

Seizing upon this rationale, appellants present three reasons for classifying Citibank's deficiency claim separately from the other unsecured creditors. They first justify separate classification because the Debtor intended "to cure all pre-petition defaults." The claim, however, is belied by the Debtor's failure, despite pre-petition income of nearly $500,000, to even attempt a cure of the four-month default amounting to less than $130,000.

Appellants also suggest that the legal nature of Citibank's nonrecourse unsecured claim, arising by operation of law under 11 U.S.C. § 1111(b), differs substantially from the recourse trade debt. This distinction was considered and rejected by the Fifth Circuit in *Greystone III, supra,* and by the Fourth Circuit in *Bryson Properties, XVIII, supra* (citing *Greystone III* favorably). Moreover, the argument ignores the Code's elimination of any legal distinction between the nonrecourse deficiency claims and other unsecured claims. *See* 11 U.S.C. § 1111(b)(1)(A); *see also Lumber Exchange,* 968 F.2d at 649; *Greystone III,* 948 F.2d at 139; *Piedmont Assocs. v. Cigna Property & Cas. Ins. Co.,* 132 B.R. 75, 78 (N.D.Ga.1991).

Finally appellants argue that classifying Citibank's unsecured deficiency claim with the unsecured trade claims may violate section 1122 since it would "disenfranchise the votes of *in personam* creditors." Of necessity, the argument assumes that the trade claims were truly impaired. However, as the bankruptcy court observed:

> The $26,800 of the unsecured claims may well be an artificially impaired class. The Debtor has not been servicing the debt to Citibank for a long time and assuredly has the funds to pay these claims in full at confirmation and if for some reason such funds are not available, the Debtor's partners, in all likelihood, have access to funds sufficient to pay these claims at confirmation.

June 5th Order at 28. The trade creditors, whose unsecured claims amount collectively to no more than five percent of the outstanding debt, would not be prejudiced since their claims would be paid in full. *See id.* Indeed, at oral argument, Citibank reaffirmed its willingness to pay all the trade debt. This silences any claim of unfairness, much less disenfranchisement, for without these creditors as an impaired class, section 1129(a)(10), (b) would not apply. In addition, the amount of trade debt

is minimal compared to Citibank's unsecured claim. There appears, therefore, no practical reason why 266 WA should classify the unsecured claim separately.

Because Citibank would dominate the vote in any class in which its claims were placed, the Debtor's only hope for confirmation lay in separately classifying Citibank's unsecured deficiency claim. Appellants, however, have offered no legitimate reason for the separate classification. Like the bankruptcy court, it appears to this Court that "the only possible reason which this Debtor has for separate classification is to fabricate an accepting class under 11 U.S.C. § 1129(a)(10) in order to effectuate a cramdown." June 5th Order at 26. As other courts have concluded, this sleight of hand is improper. *See, e.g., Lumber Exchange,* 968 F.2d at 650.

Nevertheless, appellants contend that the permissive nature of section 1122(a) and the Code's legislative purposes justify their Plan's manipulation of classification. They rely heavily on *In re Triple R Holdings,* 134 B.R. 382 (Bankr.N.D.Cal.1991) in arguing that the bankruptcy court's interpretation of sections 506(a) and 1111(b) undermines the legislative policy favoring reorganizations. That reliance is misplaced; the District Court of the Northern District of California reversed the decision a few days before oral argument of this appeal. *See* 145 B.R. 57 (N.D.Cal.1992).

 Moreover, the Bankruptcy Court's interpretation of sections 506(a) and 1111(b) comports with the democratic voting power that the Code gives the majority of any class of claims. *See* 11 U.S.C. § 1126(c), (d). Courts have recognized that granting a deficiency creditor voting power commensurate with the amount of its claim gives effect to the statutory meaning of sections 506(a) and 1111(b). *See Greystone III,* 948 F.2d at 140; *In re Pine Lake Village Apt. Co.,* 19 B.R. 819, 831 (Bankr. S.D.N.Y.1982); *see also In re Cantonwood*

*Assocs. Ltd. Partnership,* 138 B.R. 648, 653–55 (Bankr.D.Mass.1992); *In re Meadow Glen Ltd.,* 87 B.R. 421, 426–27 (Bankr. W.D.Tex.1988). Broad policy considerations cannot override specific statutory provisions. *Cantonwood Assocs., supra.* Any policy favoring reorganization must yield to the Code's statutory provisions.[3]

Because appellants could not propose a confirmable plan without improperly classifying creditors, no reasonable possibility exists that 266 WA could successfully reorganize within a reasonable time. Citibank is thus entitled to relief from the automatic stay. Under these circumstances, the bankruptcy court below was free to dismiss the petition. *See* 11 U.S.C. § 1112(b).

### Conclusion

For the foregoing reasons, the order of the bankruptcy court granting Citibank's motion for section 362(d) relief and dismissing the Debtor's Chapter 11 petition is affirmed.

SO ORDERED.

---

**3.** The Court also notes that the Debtor's first default occurred only ten months after it had refinanced the Property for $3.4 million. The bankruptcy petition followed only four months later—and within a week of Citibank's foreclosure action. The Property's subsequent rapid "recovery" from its dire financial condition suggests that the Debtor's reorganization may have been an attempt to renegotiate a loan whose terms no longer seemed favorable. Congress cannot have intended such a use of Chapter 11.