**In re Harry DEAN & Samuel Carson d/b/a 1801 Randolph Building Co., A Partnership, EIN 13–3669965, Debtor.**

**Bankruptcy No. 11–93–12321 MA.**

United States Bankruptcy Court,
D. New Mexico.

April 28, 1994.

950

David T. Thuma, Albuquerque, NM, for debtor.

Leslie C. King III, Santa Fe, NM, for Connecticut Mut.

### MEMORANDUM OPINION

MARK B. McFEELEY, Chief Judge.

This matter is before the Court to consider whether to confirm the Debtor's Chapter 11 Plan of Reorganization. The Court will deny confirmation for the reasons stated below, any one of which, in the opinion of the Court, would be sufficient in and of itself.

### FACTS

The Debtor is a general partnership that owns and operates an office building located at 1801 Randolph Street, SE, Albuquerque, New Mexico (the "Property"). The Property is leased to a single tenant, BDM Corporation, whose lease expires in February 1995.[1]

The general partners of the Debtor, Harry Dean and Samuel Carson, originally acquired the Property in 1987 for approximately $6,300,000. Dean and Carson paid approximately $2,000,000 in cash and borrowed the $4,300,000 remainder from Connecticut Mutual Life Insurance Company ("Connecticut Mutual") on a nonrecourse basis. The partners owned the Property as tenants in common until January 1, 1992 when they transferred the Property to the Debtor. However, the deed to the Property was not recorded until September 2, 1992.

On May 1, 1992 the Connecticut Mutual note matured and Dean and Carson defaulted by not paying the unpaid balance due. The parties attempted unsuccessfully to renegotiate the loan. On October 8, 1992, Connecticut Mutual filed a Complaint for Foreclosure and Collection on Note in the Second Judicial District Court, Bernalillo County, New Mexico (the "state court"). On December 18, 1992, the state court appointed a receiver to manage the Property. The receiver has continued to manage the Property and collect the rents to this day.

On June 23, 1993, Connecticut Mutual filed a motion for summary judgment on its foreclosure complaint and to dismiss the counterclaim asserted by Dean and Carson. The motion was granted. However, the parties could not agree as to the form of order to be entered. The state court set a hearing on the form of order for July 28, 1993, but that proceeding was stayed when the Debtor filed its petition under Chapter 11 on July 27, 1993.

On November 23, 1993, the Debtor filed a proposed plan of reorganization. The Debtor's plan divides the claims against it into 6 classes. Class 1 is all Administrative Claims. Class 2 is all Priority Claims. Class 3 is Connecticut Mutual's allowed secured claim. At the confirmation hearing, the Court found that the value of the Property, and consequently the allowed amount of Connecticut Mutual's secured claim, is $2,875,000. Class 4 is all "recourse" unsecured claims. These claims consist of $1,000 owed to Howard Dean, Dean's son, for legal services and $2,500 owed to Silver & Navon, for accounting services. Class 5 is the Connecticut Mutual "nonrecourse" unsecured deficiency claim in the approximate amount of one million dollars. Class 6 is the partnership interests of the Debtor's general partners, Dean and Carson.

The Debtor's plan proposes to pay Connecticut Mutual's allowed secured claim over 7 years, with interest at 8% per annum, or such rate that the Court determines is sufficient under Bankruptcy Code § 1129(b)(2)(A)(i)(II), based on a 30 year amortization, with a balloon payment in full on the 7th anniversary of the effective date.[2] The Debtor will make monthly payments of $40,000 to Connecticut Mutual for so long as the current lease with BDM remains in force and BDM makes the monthly lease payments. If the Debtor defaults in making any payments under the plan, the plan requires

---

1. BDM is now paying above market rent, has a substantial investment in this building in the form of "clean rooms," computer wiring, and power supplies that cannot be interrupted.

2. The effective date of the plan is the date the Court enters the confirmation order. Plan at p. 7–8.

the Debtor to simply convey to Connecticut Mutual a special warranty deed to the Property in exchange for a release of all of Connecticut Mutual's claims against the Debtor and its general partners. Under the plan, the Debtor will pay the Class 4 general unsecured creditors in full 60 days after the effective date. As for Connecticut Mutual's unsecured deficiency claim, the Debtor will pay $50,000 to Connecticut Mutual 10 days after the effective date. The plan allows the partners to retain their partnership interests in the Reorganized Debtor in exchange for a capital contribution to the Reorganized Debtor equal to the greater of (1) $300,000 or (2) the amounts necessary to fund all payments due under the plan, within 60 days after the effective date.

Ballots on the Debtor's plan were due by January 18, 1994. Class 3, Connecticut Mutual's secured claim, voted to reject the plan. Class 4, the general unsecured creditors, voted to accept the plan. Class 5, the Connecticut Mutual unsecured deficiency claim, voted to reject the plan. Class 6, the partnership interests, voted in favor of the plan.

On January 19, 1994, Connecticut Mutual filed its objection to the confirmation of the Debtor's plan. The Court heard evidence on confirmation and the objection on January 21, 1994.

## DISCUSSION

### I. Connecticut Mutual's Objections to Confirmation

Since the Debtor has not obtained acceptance of the plan by vote, the plan must be confirmed pursuant to the Code's cram down provisions. 11 U.S.C. §§ 1129(A)(8), (10) and (b)(1), (2). Connecticut Mutual's objections center around the Debtor's compliance with those provisions. Each objection will be discussed separately. Several objections are meritorious and of these, any one would be sufficient to deny confirmation.

### A. Separate Classification of Unsecured Claims.

Connecticut Mutual's initial objection is that the plan improperly classifies the unsecured portion of its claim separately from the other unsecured claims in an attempt to "gerrymander" an accepting impaired class in violation of § 1122(a). Sec-

tion 1129(a)(10) provides that before a plan can be crammed down over the objections of a creditor class, at least one impaired class of creditor claims must vote to accept the plan, without including any acceptance of the plan by any insider. Thus, in order to get its plan confirmed over Connecticut Mutual's objections, the Debtor must come up with one impaired creditor class that accepts the plan. Given the size of Connecticut Mutual's unsecured deficiency claim relative to the other unsecured claims and Connecticut Mutual's opposition to the plan, it is obvious why the Debtor chose to separately classify the unsecured claims. The Debtor wants to create an impaired accepting class knowing that Connecticut Mutual's negative vote would overwhelm the votes of other claims if they were put in the same class. 11 U.S.C. § 1126(c). In other words, joint classification would mean certain defeat for the Debtor's plan because the Debtor could not satisfy the requirements of § 1129(a)(10).

Section 1122 governs classification and provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class." Even though § 1122 does not expressly require Debtors to place substantially similar claims in the same class, most courts that have interpreted this section have imposed significant limits on a Debtor's ability to separately classify. *See generally, In re SM 104 Ltd.,* 160 B.R. 202, 216 (Bankr.S.D.Fla.1993) (citing circuit court decisions from the 3rd, 8th, 5th, 6th and 11th circuits and numerous lower court decisions); *Boston Post Road Partnership v. FDIC (In re Boston Post Road Limited Partnership),* 21 F.3d 477, 482 (2d Cir.1994) (stating that all circuit courts that have visited the question have held that similar claims may not be separately classified solely to engineer an assenting impaired class); *But see, Steelcase Inc. v. Johnston (In re Johnston),* 21 F.3d 323, 328 (9th Cir. 1994) (holding that bankruptcy court did not clearly err in finding that an unsecured creditor currently in litigation with the debtor, which could create offset, was not substantially similar to other unsecured creditors, thereby allowing separate classification); *Matter of Woodbrook Associates,* 19 F.3d

312, 318–19 (7th Cir.1994) (holding that separate classification is allowed because the legal rights of an 1111(b) unsecured deficiency claimant are substantially different from those of a general unsecured creditor).

■ For example, the Sixth Circuit has noted that if a Debtor were allowed unrestrained power to separately classify, "[t]he potential for abuse would be significant.... Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class." *In re United States Truck Co.*, 800 F.2d 581, 586 (6th Cir.1986). The Fifth Circuit has even proposed an eleventh commandment, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1278–79 (5th Cir.1991). The *Greystone* court reasoned that a broad interpretation of the power to separately classify similar claims under § 1122(a), "would render § 1122(b) superfluous, a result that is anathema to elementary principles of statutory construction." *Id.* at 1278. This Court agrees.

■ The Debtor must demonstrate "reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims" in order to separately classify. *In re Washington Associates*, 147 B.R. 827, 831 (E.D.N.Y.1992). For example, the Fifth Circuit in *In re Briscoe Enter., Ltd. II*, 994 F.2d 1160 (5th Cir.1993) allowed a debtor operating a subsidized low income apartment complex to separately classify the city of Fort Worth, an unsecured creditor, because the city had a distinct noncreditor interest in maintaining an urban housing program. *Id.* at 1167. *See also, Johnston, supra.*

The Debtor offers two reasons why the claim of Connecticut Mutual is distinct from the other unsecured claims and should be separately classified. First, the Debtor argues that Connecticut Mutual's claim is fundamentally different from the other unsecured claims because Connecticut Mutual has the right to make the § 1111(b) election, which would eliminate its unsecured claim altogether. This reasoning undermines the purpose of the § 1111(b) election, which is to allow the undersecured creditor to weigh in its vote with the votes of the other unsecured creditors when deciding whether to make the election. Allowing the unsecured "trade" creditors to constitute their own class would effectively nullify the option that Congress provided to undersecured creditors to vote their deficiency as an unsecured debt. *Boston Post Road, supra*, 21 F.3d 477, 482–83; *In re D & W Realty Corp.*, 165 B.R. 127, 129–30 (S.D.N.Y.1994) (purpose of § 1111(b) is to provide an undersecured creditor an election to vote as an unsecured creditor or forego the vote and receive an allowed secured claim for the entire amount of the debt). In sum, the manner in which unsecured claimants achieved their status, "does not alter their current legal character and thus does not warrant separate classification." *Matter of Lumber Exchange Building Limited Partnership*, 968 F.2d 647, 649 (8th Cir.1992).

■ Second, the Debtor argues that Connecticut Mutual's claim is nonrecourse, whereas the general unsecured claims are recourse. This is important under § 1129(a)(7) and § 723(a), which state that a Debtor cannot confirm a plan unless the general unsecured creditors received as much as they would in Chapter 7 liquidation. In a Chapter 7, the Debtor would have to pay the recourse unsecured creditors 100%, but the Debtor could pay Connecticut Mutual nothing and still comply with § 1129(a)(7). According to the Debtor, separate classification is reasonable and necessary because it could save the Debtor more than a million dollars.

Although this scheme might make sense to the Debtor, this Court finds that the Debtor's overall purpose in separately classifying the Connecticut Mutual unsecured deficiency claim from the general unsecured claims is to create an accepting class for cram down purposes. To allow this scheme of classification would upset the critical balance of confirmation requirements set out in §§ 1129(a)(8) and (a)(10), concerning acceptance by all classes or acceptance by one impaired class. *John Hancock Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 158 (3d Cir.1993). Moreover, separate classification effectively

disenfranchises the Debtor's largest creditor and allows a small unsecured creditor voting power disproportionate to its interest in the bankruptcy estate, which violates the § 1129(b)(1) requirement that a plan not discriminate unfairly. *Id.; D & W Realty*, 165 B.R. at 129–30.

B. *The Plan Artificially Impairs the Class 4 General Unsecured Creditors.*

■ This objection also centers around the 1129(a)(10) requirement that the plan be accepted by one impaired class of creditors. Connecticut Mutual argues that the plan artificially impairs the claims in Class 4 in order to manufacture an impaired accepting class under § 1129(a)(10).[3]

■ The plan proposes to pay Class 4 claims in full 60 days from the effective date. These claims total approximately $3,500 and according to Connecticut Mutual, could easily be paid immediately upon the effective date. The Debtor has presented no business reason for the delay in payment except to have this class considered impaired for the purpose of cram down. This Debtor, like the debtor in *In re Windsor on the River Associates, Ltd.*, 7 F.3d 127, 132 (8th Cir.1993), has improperly impaired a class for purpose of trying to literally satisfy the cram down requirements. Impairment may not be manufactured at the will of the debtor. *Id.* at 131. Moreover, confirmation of a plan where the debtor engineers the impairment of the only approving impaired class "so distorts the meaning and purpose of [§ 1129(a)(10) ] that to permit it would reduce (a)(10) to a nullity." *Id.* (citing, *In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 (Bankr.D.Conn.1989)).

C. *Accepting Class of Creditors Are Insiders.*

■ Section 1129(a)(10) provides that a plan may be confirmed if at least one class that is impaired under the plan has accepted the plan, "determined without including any acceptance of the plan by any insider." Of the three general unsecured claims, the Debtor has paid the largest, the Poole firm. The next largest creditor is the son of one of the partners and is considered an insider, so his vote in favor of the plan cannot be count-

ed for § 1129(a)(10) purposes. 11 U.S.C. § 101(31)(C)(ii).

The last unsecured claim is that of the partnership's accounting firm, Silver & Navon. Connecticut Mutual argues that the vote of Silver & Navon should not be counted under § 1129(a)(10) because it is an insider under § 101(31). Connecticut Mutual argues that the definition of "insider" includes someone connected to or in a position of authority with the debtor. Dean testified at the hearing that the Debtor and its related entities use Silver & Navon as their accountants and their annual volume of business with the firm totals $25,000 to $30,000, which is not a significant percentage of the accounting firm's billings.

The Court finds that the accounting firm is not an insider or an affiliate of the debtor as defined in Code § 101(31)(C). *See, In re MCorp Financial Inc.*, 160 B.R. 941, 949 (S.D.Tex.1993) (arm's length relationship is true test of lack of insider status).

D. *The Plan Must Be Fair and Equitable—New Value and the Absolute Priority Rule.*

■ In order to confirm under § 1129(b)(1), the Debtor must show that the plan does not discriminate and is fair and equitable with respect to each class of claims or interests that is impaired and has not accepted the plan. 11 U.S.C. § 1129(b)(1). In an effort to construe the undefined requirement of the pre-Code bankruptcy law that a plan be fair and equitable, the courts created one criteria known as the "absolute priority rule." *Northern P.R. Co. v. Boyd*, 228 U.S. 482, 504–05, 33 S.Ct. 554, 560–61, 57 L.Ed. 931 (1913). Under that rule, no junior class of creditors could retain a property interest in the debtor if a dissenting class of unsecured creditors were not provided for in full. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988). This rule was incorporated into the 1978 Bankruptcy Code in 11 U.S.C. § 1129(b)(2)(B)(ii). Failure to comply with the absolute priority rule is fatal to the proposed plan of reorganization. *In re Sov-*

---

**3.** Generally, a class is impaired when the legal, equitable, and contractual rights out of which its claim arises are altered in any way. 11 U.S.C. § 1124.

*ereign Group 1985–27, Ltd.,* 142 B.R. 702, 705 (E.D.Pa.1992).

■ Connecticut Mutual asserts that the Debtor's plan is not fair and equitable because it provides less than full payment of its unsecured claim while Dean and Carson retain their partnership interests in the reorganized debtor, and therefore, the plan violates the absolute priority rule.

The plan seems to violate the absolute priority rule because Connecticut Mutual will receive only part of its unsecured claim yet the partners will retain their interests in the reorganized debtor. However, the Debtor proposes to grant the partners their interests under the so-called "new value exception" to the absolute priority rule.

The new value exception was first announced by the Supreme Court in *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Courts have been divided on whether the "new value exception" continues to be valid since the passage of the 1978 Bankruptcy Code, in which the absolute priority rule was codified without mention of the exception. The Supreme Court has yet to rule on its continued existence, although it might in the future.[4] In *Ahlers,* the last Supreme Court decision on this issue, the court found that even if the "new value exception" did exist, the new value offered in that plan was inadequate. *Id.,* 485 U.S. at 203–04 n. 3, 108 S.Ct. at 967 n. 3.

Connecticut Mutual maintains that the new value exception did not survive enactment of the 1978 Code. In the alternative, Connecticut Mutual argues that even if the exception exists, the Debtor has failed to meet its requirements.

The Court disagrees with both of Connecticut Mutual's assertions. In a cram down situation, § 1129(b)(2)(B)(ii) clearly bars prepetition owners from receiving an interest under the plan "on account of" their prior ownership interests. "However, when prepetition owners infuse into the reorganized debtor necessary new value in the form of money or money's worth, the basis of their equity interest in the reorganized debtor is not their prepetition ownership interest in the debtor, but rather their payment of new value for an interest in the reorganized debtor." *SM 104 Ltd.,* 160 B.R. at 225. Therefore, the infusion of a reasonable amount of new capital by prepetition owners in exchange for the equity interests of the reorganized debtor does not technically violate the absolute priority rule because the old owners are not receiving their interest "on account of" their prior ownership interest, but "on account of" the new value contributed. *See id.* (describing the misnomer of the new value exception and renaming it the "new value corollary").[5]

■ However, before the purchase of the equity in the reorganized debtor is held to be consistent with the absolute priority rule, courts must analyze whether the new value meets three requirements to determine if the old equity owners are infusing sufficient new value in exchange for their new interests in the reorganized debtor. Under Bankruptcy Act practice, and presumably under Code practice, the equity holders must offer value that is (1) in money or money's worth, (2) necessary for a successful reorganization and (3) reasonably equivalent to the value of the new equity interest in the reorganized debtor. *SM 104 Ltd.,* 160 B.R. at 226; *see also, In re Unruh,* 987 F.2d 1506, 1510 (10th Cir. 1993).

---

4. The Supreme Court granted the petition for certiorari in *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993), petition for cert. granted, —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (January 10, 1994), a case in which the Ninth Circuit held that the "new value exception" survived enactment of the Code. Recently, the case settled, but the Supreme Court directed the attorneys to present oral arguments as to whether the Ninth Circuit decision should be vacated or dismissed. "Weekly News and Comment," 25 B.C.D. Issue 11 (April 14, 1994) at pp. A1 and A8.

5. The court in *SM Ltd.* noted that sound policy reasons warrant this analysis. According to Professors Baird and Jackson, when a business becomes insolvent, the existing equity is valueless. However, the going concern value of the business is an asset that can be liquidated on behalf of creditors. *Id.* at 225, citing, Douglas G. Baird & Thomas H. Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule,* 55 U.Chi.L.Rev. 738 (1988).

■ The plan provides that Dean and Carson shall retain their partnership interests in the reorganized Debtor only if they make a capital contribution equal to (i) $300,000 or (ii) the amounts necessary to fund all payments due under the plan within 60 days after the effective date, whichever is greater. The Debtor asserts that the capital contribution is substantially more than the partnership interests are worth, will be paid in cash, and is necessary for the Debtor to reorganize, therefore, the payment meets all of the elements.

Obviously, the proposed cash contribution meets the first requirement. As for the second requirement, the capital infusion is necessary for a successful reorganization because the reorganized Debtor will have to make certain tenant improvements in order to renew its lease with BDM or, if necessary, attract new tenants to the building.

■ The Debtor must also show that the partners' proposed infusion of value is reasonably equivalent to the value of the equity interest in the reorganized Debtor. A specific determination of the value of the equity interests of the reorganized Debtor has been described as "a guess compounded by an estimate". *SM 104 Ltd.*, 160 B.R. at 228, quoting Prof. Peter Coogan, H.R.Rep. No. 595, 95th Cong., 1st Sess. 222 (1977). Suffice it to say, the valuation is quite complex, with the usual income capitalization approach a useless endeavor.

Even though the Debtor has but a single asset which is fully encumbered, the equity interests in the reorganized Debtor are of some value. The equity interests are valuable for several reasons. The most obvious reason is that the Property may end up being worth more than $2,875,000, and the partners would be entitled to the increased value, since Connecticut Mutual's secured claim is limited to the value set by the Court. Also, control of the reorganized debtor as a going concern has some value, as well as the future income from an above market lease and possible new lucrative lease. The $300,000 bid is, in effect, a bet that the Court's valuation of the BDM property is low, and that there will be residual value left for the partners to take advantage of once the Connecticut Mutual loan is paid off. *SM 104 Ltd.*, 160 B.R. at 230. Considering all of the

facts before it, the Court holds that the $300,000 proposed capital contribution is reasonably equivalent to the value of the equity interests in the reorganized debtor. *See, Woodbrook*, 19 F.3d 312, 319–20 (new value contribution must be real and necessary to the successful implementation of a feasible plan).

E. *The Plan Is Not Fair and Equitable With Respect to Connecticut Mutual's Secured Claim.*

■ Section 1129(b)(2)(A) sets forth minimal standards that a plan must meet to be considered fair and equitable. With respect to a class of secured claims a plan must provide:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; . . .

The Debtor's plan attempts to meet these requirements with respect to Connecticut Mutual's secured claim by making cash payments over 7 years, with interest at 8% per annum, or such rate that the Court determines is sufficient under Bankruptcy Code § 1129(b)(2)(A)(i)(II), based on a 30 year amortization, with a balloon payment in full on the 7th anniversary of the effective date. Section 1129(b)(2)(A)(i) has three requirements: the plan must (1) allow Connecticut Mutual to retain its lien on the collateral, (2) provide for cash payments totalling at least the allowed amount of Connecticut Mutual's secured claim (the "face amount") test, and (3) provide Connecticut Mutual with payments of a present value at least equal to the value, as of the effective date, of its secured claim (the "present value test"). *SM 104 Ltd.*, 160 B.R. at 231. As long as Connecticut Mutual's claim is undersecured and it has not made the § 1111(b) election, if the plan satisfies the present value test, with respect

to the secured claim, it will necessarily satisfy the face amount test. *Id.*

In the Court's view, however, the plan fails to meet the present value test because the value of the future payments is not assured by a nonrecourse loan. The Debtor is asking Connecticut Mutual to accept an unusually high risk by maintaining the loan's nonrecourse status. Little of the principal on the note would be paid, even by the seventh year of a thirty-year amortization. The partnership would have no continuing obligation to pay any deficiency which might arise from a foreclosure at that time. The Debtor always has the option of abandoning the property if it is not able to renegotiate the BDM lease or at any other time. It simply is not fair and equitable for this Court to allow the Debtor to write down this loan, keep the property, and maintain the nonrecourse status of the loan.

IT IS ORDERED that confirmation of the plan proposed by the Debtor is denied. This opinion shall constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052. An appropriate order shall enter herewith.