**In re Lorraine COTTLE, Debtor.**

**Bankruptcy No. 95–16834DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 30, 1995.

Peter D. Schneider, Community Legal Services, Inc., Philadelphia, PA, for debtor/plaintiff.

Michael Pileggi, Philadelphia, PA, Douglas K. Jenkins, Philadelphia Gas Works, Philadelphia, PA, for defendants.

Edward Sparkman, Chapter 13 Trustee, Philadelphia, PA.

Joseph Minni, United States Trustee, Philadelphia, PA.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Joint Motion of the Philadelphia Housing Authority ("PHA") and Philadelphia Gas Works ("PGW")[1] to Dismiss Chapter 13 Proceedings[2] or in the Alternative for Relief from the Automatic Stay (the "Motion"). PHA contends that Debtor's Chapter 13 case, which was filed to stay eviction proceedings, and her Chapter 13 plan, which proposes to pay $10.00 per month for 36 months, were filed in bad faith, and dismissal pursuant to 11 U.S.C. § 1307(c)(1) should be granted. PHA also argues that relief from the automatic stay of § 362(d) should be granted to allow it and PGW to proceed with their state court remedies. Because we disagree and find no cause to dismiss or otherwise for relief, the Motion will be denied.

### BACKGROUND

Debtor Lorraine Cottle is and has been a PHA tenant since December 1, 1988. She presently resides with her six minor children at 2021 North 22nd Street, Philadelphia ("22nd Street Premises") pursuant to a lease dated January 13, 1995 (the "Lease"). Exhibit M–1. Debtor is what is known as a negative renter, *i.e.*, her monthly utility allowance from PHA exceeds her monthly rent. Pursuant to federal regulations, PHA must provide Debtor with a utility allowance (the "Allowance") to insure that her total shelter costs, including utilities, do not exceed 30% of her household income. *See* 24 C.F.R. §§ 965.470 *et seq.;* 24 C.F.R. § 913.102 *et seq.* Her Allowance is $355[3] monthly from which PHA deducts her rent of $141.00. The balance of $214.00 is remitted monthly to Debtor for the payment of month-

ly utility bills from PGW and PECO Energy ("PECO").

Prior to residing at the 22nd Street Premises, Debtor resided at 3203 West Turner Street, Philadelphia where she also received an Allowance and was a negative renter. She acknowledges a debt of $6785.64 to the utility companies arising from her failure to direct her Allowance as intended. The delinquency with PGW resulted in termination of service on two occasions.

On May 16, 1995, PHA served Debtor with a lease termination notice. Lease termination proceedings were at the briefing stage in Philadelphia Municipal Court when the instant Chapter 13 case was filed on September 5, 1995. Debtor timely filed her Statement of Financial Affairs, Schedules and Chapter 13 Plan (the "Plan"). Debtor has listed eleven unsecured creditors including PECO with an unsecured claim of $718.96 and PGW with a disputed unsecured claim of $6646.00 for utility usage at her present and prior residences. Her Chapter 13 Plan proposes to pay $2.00 per month for four months and $10.00 for 32 months.[4] It also provides for her assumption of the Lease.

Initially Debtor testified that since the she moved into the 22nd Street Premises, she had not made any utility payments. Record at 24. Approximately one month ago Debtor received a bill of approximately $1000 from PGW for service provided at the 22nd Street Premises; it was followed two weeks later with a shut off notice. Debtor contends that she has made no payments to PGW because she is being billed for her present and prior apartments. Debtor also contends that the bill was incorrect due to the bankruptcy filing and she is waiting for a corrected bill to

---

1. PGW did not appear at the hearing on the Motion or file any brief in support of the relief being sought. The Motion is also somewhat ambiguous as to whether PGW is even asking for certain of the relief sought. Moreover, certain of the contentions made are inappropriate when applied to PGW. *See* Motion ¶¶ 10, 11, 12, 13 and prayer for relief. As a result, we refer herein to PHA as the moving party although technically this is a Joint Motion.

2. PHA relies on 11 U.S.C. §§ 1325(a) and 109(g) to support its request for dismissal. Since the record does not evidence a prior filing by Debtor, PHA's request for relief under § 109(g) is inexplicable and therefore is denied.

3. Of this sum, $144.00 is attributable to electric service and $211.00 for gas service.

4. The initial payments are set lower while the Debtor is making installment payments of her bankruptcy filing fee.

be issued.[5] With respect to electric service, the Debtor subsequently testified that she paid $60.02 in October to pay her last electric bill. Record at 26.

## DISCUSSION

### A. *Dismissal*

Initially PHA urges us to dismiss this Chapter 13 case pursuant to 11 U.S.C. § 1307(c)(1) which is one of the enumerated grounds establishing "cause" for conversion or dismissal under § 1307. Subsection (c)(1) allows conversion or dismissal where the Court finds "unreasonable delay that is prejudicial to creditors." PHA also contends that Debtor's use of the Utility Allowance represents a debt incapable of cure under § 1325(a) and that her Plan is otherwise not proposed in good faith. Motion ¶ 11. Finally PHA, in its brief, seeks refuge in the judicially developed doctrine, as evidenced by this Court's decision in *In re Dami*, 172 B.R. 6 (Bankr.E.D.Pa.1994), that bad faith filings merit dismissal under § 1307(c) and Rule 9011.

While we understand PHA's frustration with its tenant who historically has failed to pay her utilities with funds advanced by PHA for that specific purpose, that history does not compel us to preclude her from proceeding with a Chapter 13 case. There is nothing in this case, the Debtor's first bankruptcy filing, that resembles the abusive situation identified in *Dami* where the Debtor had filed four previous cases and misrepresented his assets and liabilities and expenses in documents filed with the Court. We see no evidence of delay; all required documents were filed in a timely manner and all installment payments of her filing fee have been paid. We note that this Motion was filed less than two weeks after the commencement of this Chapter 13 case so that the opportunity for delay was hardly present. A motion un-

der § 1307(c)(1) appears somewhat premature at this stage.

■ Nor can we find that the Debtor's Plan was filed in bad faith or that the utility indebtedness presents an obstacle to confirmation. With respect to bad faith, PHA seems to imply that a plan which proposes a $10.00 monthly payment to the Chapter 13 Trustee is per se filed in bad faith. We disagree.

Presumably PHA relies on § 1325(a)(3) which states that the Court shall confirm a plan only if—

   (3) the plan has been proposed in good faith and not by any means forbidden by law; ...

The Third Circuit Court of Appeals in *In re Hines*, 723 F.2d 333, 334 (3d Cir.1983), concluded, as had every court of appeals that had decided the issue at that time, that "Chapter 13 plans providing for nominal repayments to unsecured creditors do not, for that reason, violate the good faith standard of 11 U.S.C. § 1325(a)(3)".[6] *See also In re Waldman*, 88 B.R. 59, 62 (E.D.Pa.1988). To the extent any courts thought otherwise, in 1984 Congress clarified that the good faith requirement of § 1325(a)(3) did not require any minimum dividend to unsecured creditors when it enacted § 1325(b) as part of the consumer credit amendments adopted under the Bankruptcy Amendments and Federal Judgeship Act of 1984. 5 Collier on Bankruptcy ¶ 1325.08 at 1325–61 (15th ed. 1995). That section added the concept of "disposable income" and requires a debtor to apply all projected disposable income to make payments under the plan or be subject to objection to confirmation by the trustee or an unsecured creditor. Congress having established this "ability to pay" test as a requirement of a confirmable plan, it seemed then clear that the notion of good faith contem-

---

**5.** Debtor testified that she contacted PGW after the termination notice was received and was told that it had no knowledge of the Debtor's filing and would send a corrected bill. Record at 26. The period encompassed by the $1000 bill was not elicited from Debtor, and PHA's efforts to introduce PGW's billing records through a PHA witness were unsuccessful. Accordingly, the Court cannot determine what portion of the $1000 was incurred post-petition.

**6.** Most recently, the Court in *In re Farmer*, 186 B.R. 781, 783 (Bankr.D.R.I.1995) stated:

   Providing creditors with a dividend equal to what they would receive in a Chapter 7 liquidation is not per se satisfaction of the good faith requirement, nor is the offer of a really small dividend tantamount to bad faith, per se.

plated by § 1325(a)(3) should be defined in traditional terms, *i.e.*, honesty in fact and the absence of serious debtor misconduct or abuse. *Id.* ¶ 1325.04 at 1325–22. *See also In re Gathright,* 67 B.R. 384, 390 (Bankr. E.D.Pa.1986). Applying these concepts to the instant Motion, we refuse to dismiss Debtor's case on the grounds that her Plan is in bad faith because it proposes a $10.00 dividend to unsecured creditors. If PHA, or for that matter the Chapter 13 trustee or any other unsecured creditor, believes the Plan does not meet the requirements of § 1325 as we have articulated them, an objection to plan confirmation can be lodged at the appropriate time.

■ PHA appears to be aggrieved by this Debtor's failure to utilize Chapter 7, with its speedy discharge and shortened protection of the automatic stay, over Chapter 13. PHA, never in arrears due to the negative rent arrangement, complains that it is disabled from acting for three years because of the automatic stay. We fail to understand its concern. If Debtor is in breach of the Lease by reason of a *post-petition* default, PHA has its remedies under § 362(d). In any event, we do not find the consequences to PHA to be determinative of whether the Chapter 13 filing and Plan are in good faith. Rather we must scrutinize the Plan in the context of Debtor's testimony to determine whether there is any abuse evident in her opting for protection under Chapter 13.

Upon examination Debtor stated that she chose Chapter 13 over Chapter 7 "because I feel good about myself personally. If I can pay some of what—if I can pay what I can pay as far as my bills, I feel good about myself personally." Record at 44. While the $10 per month over 36 months is a minor fraction of her $10,000 debt, she also testified that such amount is all her disposable income.

■ This testimony seems somewhat at odds with the Debtor's history of using PHA funds earmarked for utility payments for other purposes as well as not utilizing a $5000 rent abatement to cure any of the outstanding arrearages to the utility companies. With respect to the use of the Allowance for other purposes, Debtor testified that she was not told it should be used to pay her utility bills. While PHA's representative testified that it was PHA's policy to advise tenants who are receiving the Subsidy that they have to pay for their utilities, there was no evidence that anyone had actually so advised Debtor. While we find it somewhat incredible that Debtor could think that PHA was sending her the Allowance to be utilized as she saw fit, we do not think the remedy for her past misconduct is to preclude her from bankruptcy relief.

We are prepared to give Debtor the benefit of the doubt, particularly at this early stage of the case and assume that she is sincere about her purpose in filing Chapter 13. As stated above, there is no harm to PHA or PGW in so doing. If her postpetition conduct belies her expressed intentions, we can revisit this issue at confirmation or in the context of a renewed motion. Accordingly, we deny PHA's Motion in so far as it seeks dismissal of this Chapter 13 case.

### B. *Relief From Stay*

PHA and PGW, in the alternative, seek relief from stay pursuant to 11 U.S.C. § 362(d). The Motion is silent as to what subsection of § 362(d) they rely upon. PHA's contention is that Debtor's misuse of the Allowance "represents a debt incapable of cure under § 1325(a)." Motion ¶ 11. In the context of a § 362(d) motion, we understand PHA to be contending that defaults (monetary and/or non-monetary) under the Lease cannot be cured and thus the Plan, which contemplates assumption of the Lease, is unconfirmable. Accordingly, we assume PHA moves under § 362(d)(2) requiring the Debtor to demonstrate that the Lease is necessary to an effective reorganization.[7] 11 U.S.C. § 362(g)(2).

---

**7.** There is obviously no equity in the Lease so the first prong of § 362(d)(2) is met. However, both prongs must be satisfied in order to grant movant relief. Our analysis then focuses on whether the Lease is necessary for an effective reorgani- zation. It is well accepted that reorganization as it is used in § 362(d)(2) applies to Chapter 13 cases which are more commonly referred to as "adjustments of debts." *In re Pittman,* 8 B.R.

■ The United States Supreme Court articulated the standard for measuring whether property is necessary to an effective reorganization in *United Savings Association of Texas v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988):

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*Id.* at 375–77, 108 S.Ct. at 632–33 (citation omitted; emphasis in original). As our Circuit Court of Appeals has recognized, the debtor must show that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates*, 987 F.2d 154, 157 (3d Cir.1993) (quoting *In re 266 Washington Assocs.*, 141 B.R. 275, 281 (Bankr.E.D.N.Y.), *aff'd*, 147 B.R. 827 (E.D.N.Y.1992)), *reh'g denied, en banc* (3d Cir. February 19, 1993). While the foregoing decisions were rendered in the context of Chapter 11 cases, the principle for which they stand has equal force in Chapter 13.

In order to determine whether the Lease is assumable and therefore necessary to an effective reorganization, we turn first to the relevant provisions of the Plan. Debtor's intentions with respect to the Lease are set forth in Paragraphs 6, 7, 9 and 10 of the Plan which read as follows:

> 6. The debtor will assume her public housing lease for the residential premises located at 2021 N. 22nd Street, Apt. C, Philadelphia, Pennsylvania ("the premises"), for use as her residence. Confirmation of this plan shall constitute a judicial finding that the lease is assumable by the debtor and shall constitute judicial approv-

al of the assumption of the lease by the debtor.

> 7. Pursuant to 11 U.S.C. § 1322(b)(3), any past default under the residential lease for the premises, including but not limited to any defaults arising out of the debtor's failure to make payments toward her utility bills, are waived. Such defaults as may exist shall be cured by the payments under this plan.

> 9. Confirmation of the plan shall constitute a finding that the debtor is promptly curing any default of her public housing lease agreement with the Philadelphia Housing Authority, pursuant to 11 U.S.C. § 365(b)(1)(A).

> 10. The debtor will maintain gas and electric service at the premises. Her maintenance of gas and electric service shall constitute adequate assurance by the debtor of the cure of any default of her public housing lease agreement with the Philadelphia Housing Authority, pursuant to 11 U.S.C. § 365(b)(1)(A).

Initially PHA contends that the utility payments are rent under the Lease and failure to pay represents a monetary default [8] which the Debtor must cure or provide adequate assurance of cure for the Lease to be assumed. 11 U.S.C. § 365(b)(1). In response Debtor contends that there is no monetary default under the Lease since the utility payments are not rent. However, even if they are, Debtor argues that § 525 prevents PHA from evicting Debtor based on a prepetition monetary default. We will first examine PHA's contention that the utility payments are rent.

### 1.

■ Both PHA and the Debtor direct the Court to the same provisions of the Code of Federal Regulations ("C.F.R.") as dispositive of the question of whether rent includes utility payments when those payments are made

---

299 (D.Colo.1981); *In re McAloon*, 1 B.R. 766 (Bankr.E.D.Pa.1980).

**8.** PHA failed to establish what amount of the approximately $6785.64 due to PGW is attributable to her current Lease. Whatever the characterization of the utility payments may be, clearly that portion attributable to the West Turner

Street Premises is an unsecured claim held by PGW subject to discharge upon Debtor's completion of her plan payments. Because we find the utility payments not to be rent, the allocation of the prepetition arrearages is not relevant to our decision.

directly to the utility companies which have billed the tenants for the service provided. Not unexpectedly each reaches a different conclusion.

We begin with the definition of Tenant Rent contained in 24 C.F.R. § 913.102:

> Tenant Rent. The amount payable monthly by the Family as rent to the PHA. Where all utilities (except telephone) and other essential housing services are supplied by the PHA, Tenant Rent equals Total Tenant Payment. *Where some or all utilities (except telephone) and other essential housing services are not supplied by the PHA and the cost thereof is not included in the amount paid as rent, Tenant Rent equal Total Tenant Payment less the Utility Allowance.* (Emphasis added).

*See also id.* § 965.470 ("Allowances for Tenant–Purchased Utilities represent fixed dollar amounts which are deducted from the Total Tenant Payment otherwise chargeable to a tenant who pays the actual Utility charges directly to the Utility suppliers, whether they be more or less than the amount of the Allowances").[9] Two other definitions bear examination. Total Tenant Payment is the monthly amount calculated under § 913.107. *Id.* Section 913.107 establishes the Total Tenant Payment as a percentage of the Family's Monthly Adjusted or Monthly Income, whichever is larger.

A plain reading of the regulations leaves little doubt that rent does not include utility payments. Indeed nowhere in the definition of Tenant Rent is there any reference to utility *payments* (as opposed to Utility Allowances) which are determined by the utility companies based on actual usage. Rather it is clear that since all tenants' Total Tenant Payments must be calculated according to the same formula, Total Rent must exclude the Utility Allowance so the tenants who pay for their utilities directly are excused from that monetary obligation to PHA. PHA's

contention that this construction results in unequal treatment of PHA tenants ignores the reality of the two separate programs that have been established under applicable law. In one, the tenants are obligated to PHA who has the responsibility for providing and billing for utility services to the tenants. In the other, the service and the obligation runs directly between the tenant and the utility company. While one may question the wisdom of a program that has no safeguards against the misapplication of Utility Allowances provided by PHA, the remedy lies in the program and not in finding a monetary obligation to PHA where one does not exist. The fact that PHA cannot terminate a negative renter for non-payment when it fails to pay its utilities and can do so with respect to conventional site tenants who are obligated to PHA is a consequence of which entity is providing the service. PHA's problem appears to be more with the wisdom of the program than the enforcement of its Lease provisions.

Having found there to be no rent due under the Lease, either pre- or post-petition, we will now turn to the Lease to determine whether Debtor's pre- or post-petition conduct with respect to payment of her utility bills forecloses an assumption of the Lease under her Plan as she intends. If so, a reorganization may not be possible and relief from the automatic stay may be warranted under § 362(d)(2).

### 2.

■ PHA cites to Paragraphs 5A, 8C [10] and 8D and 13A(1) and (2) as supporting its contention that Debtor's "failure to pay for her utilities with the utility allowance provide [sic] to her by PHA and to maintain her utilities is a breach of her lease agreement subjecting her to lawful termination of the lease." PHA Post–Trial Memorandum at 10.

Paragraph 5 dealing with Utilities states:

9. Under this formulation, a tenant whose utility use is conservative will be able to retain the excess Utility Allowance whereas a tenant with excessive use will be responsible for paying the difference.

10. Paragraph 8C requires compliance with "necessary and reasonable regulations established by

Management" which "shall be posted in the Management's office, and incorporated [in the Lease] by reference." Notwithstanding this reference, PHA points to no posted regulation established by Management that Debtor has failed to abide by.

A. Management shall supply those utilities as indicated by an [x]: [ ] electricity. [ ] gas, [ ] water, [ ] heat. Tenant will pay for all other utilities, related deposits and charges on Tenant's utility bills. All Scattered Sites Tenants and other Tenants to whom Management has not agreed to supply utilities, must pay their own utility bills, related deposits and charges as determined by the utility company.

B. Tenant agrees to pay excess utilities as assessed by Management in accordance with the schedule of current Utility Allowances/Tenant Purchased Utilities on or before the first (1st) day of the second calendar month following the month in which the excess charges are incurred.... If Tenant fails to pay the excess utility charges on the due date, the Tenant shall be in default, and Management may, at its option terminate the Lease and file for eviction of the Tenant from the Premises.

Paragraph A sets forth PHA's responsibility, if any, to supply utilities and states that where it is not doing so, the Tenant must pay its own utility bills as determined by the utility company. Paragraph 5 is silent as to PHA's remedy upon the Tenant's failure to make the payments. Rather the only remedy for a breach contained in Paragraph 5 is PHA's option of termination and eviction where the Tenant fails to timely pay excess utility charges assessed by PHA. Since PHA does not assess excess utility charges, or any utility charges for that matter, on Debtor, we will have to look elsewhere in the Lease to discover PHA's remedy for a Tenant's failure to pay utility bills.[11]

■ PHA points us to Paragraph 13 which sets forth the various events of Default under the Lease and specifically references subparagraphs 1 and 2. Subparagraph 1 designates the Tenant's failure "to pay any installment of Rent or other monetary charge *due to Management*" as a default. Since the utility payments are due to PGW and PECO, and not PHA, this default is not applicable here. Subparagraph 2 designates the Tenant's neglect or failure "to perform any of the prom-

ises, terms, provisions or conditions contained in the Lease, and fails to cure such default within the time period prescribed by Management." The failure to pay utility bills is such a promise, term and provision.

Furthermore, to the extent the Debtor's failure to pay utility bills is, as PHA contends, a violation of building and housing codes materially affecting health and safety proscribed by 24 C.F.R. § 966.4(f)(5) and not a use of utilities in a reasonable manner proscribed by 24 C.F.R. § 966.4(f)(8), there would be a default arising under Paragraph 13(2) by reason of Paragraph 8 D of the Lease pursuant to which a Tenant agrees:

To comply with all obligations imposed upon Tenants by applicable provisions of City, State, and Federal building and housing codes materially affecting health and safety.

■ We do not find, however, that the above referenced federal regulations are implicated by the facts of this case. The provisions of building and safety codes materially affecting health and safety identified by PHA are contained in Section 7–305 of the Philadelphia Code which states:

No owner, operator or occupant shall cause any service, equipment or utility which is required by this Title to be removed, shut off or discontinued for any occupied dwelling let or occupied by him[.]

The record is clear that there has been no removal, shut off or discontinuance of service, equipment or utility with respect to the 22nd Street Premises which are the subject of the Lease. While there was a utility service shut off with respect to the prior residence at West Turner Street, PHA clearly moved past that issue when it entered a new Lease with the Debtor for the 22nd Street Premises. Nor is there any evidence that Debtor has failed to use her utilities in a reasonable manner. PHA equates use of the Utility Allowance with use of her utilities. They are not the same. Furthermore, the potential that continued misapplication of the Utility Allowance could ultimately result in a service shut off is too speculative to be

---

**11.** PHA relies on Paragraph 5B as support for its contention that Debtor's failure to use the Utility Allowance to pay her utility bills violated federal regulations. While we will examine that contention *infra,* that provision of the Lease is clearly not a foundation for this argument.

deemed a present violation of the housing code. In so stating, we recognize that this Debtor has a history of failing to utilize her utility allowance to pay her utilities. To the extent that she resumes her improper conduct and causes the service to be shut off at the 22nd Street Premises, PHA will have cause for relief from stay. However, for now, PHA's request for relief based on a breach of federal regulations is premature.

Indeed the only Lease default that has been established on this record is Debtor's prepetition failure to pay PGW for service at the 22nd Street Premises. As stated before, the claim for utilities provided to her prior residence is an unsecured claim of the utility companies in this bankruptcy. While we recognize that Debtor does owe PGW payment for post-petition service, at the time of the hearing she was awaiting a revised bill due to some billing confusion between her prior and present premises. She testified that upon receipt of that bill, she would pay PGW. To assure that result as promised, we will condition continuation of the automatic stay on Debtor's escrow with PHA of sufficient monies from her Utility Allowance to cover the payment for outstanding post-petition utility services from PGW and PECO received but not paid for.

More than this is not now required. We find that Debtor has offered adequate assurance to PHA in her Chapter 13 Plan with respect to the non-monetary default of failing to pay utility bills. Paragraph 10 of the Plan states that the Debtor will "maintain gas and electric services at the premises." While that undertaking may be somewhat ambiguous, the Debtor's commitment as stated in her Memorandum in Opposition to the Motion is to cure the non-monetary breach "by assuring that she will pay her postpetition electric and utility bills as they come due." Since she will be receiving a Utility Allowance, she is able to perform this commitment so long as she uses it as intended. Given Debtor's past history and Debtor's articulated commitment to pay her bills in a timely manner, we see no prejudice to her to build in assurance to PHA that she will fulfill her promise. Her Plan can be amended to so provide. For example, she can escrow with PHA out of the Utility Allowance a sum sufficient to cover her current utility bills. Upon receipt of her bills each month and after verification of their accuracy, she could direct PHA to release the escrow amount by paying the utilities and remitting the balance to her. Based on the foregoing, we believe the Debtor has met her burden under § 362(d)(2)(B). Accordingly, we deny the Motion insofar as it seeks relief from the automatic stay.

An appropriate order will be entered.

### *ORDER*

**AND NOW,** this 30th day of November, 1995, upon consideration of the Joint Motion of the Philadelphia Housing Authority ("PHA") and Philadelphia Gas Works ("PGW") to Dismiss Chapter 13 Proceedings or in the Alternative Relief from the Automatic Stay (the "Motion") and the record of the hearing held on October 19, 1995, and the post-trial submissions of the parties, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that the Motion is **DENIED,** provided, however, that Debtor shall allow PHA to hold in escrow sufficient monies from her Utility Allowance to cover payment for post-petition utility services from PGW and PECO Energy received but not paid for.