**In re ZRM–OKLAHOMA PARTNER-SHIP, a/k/a Lexington Apartments and Motor Inns–Oklahoma, Debtor.**

**Bankruptcy No. 92–16351–BH.**

United States Bankruptcy Court, W.D. Oklahoma.

June 28, 1993.

Doneen Douglas Jones, of Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, OK, for IDS Life Ins. Co.

Gerald P. Urbach, of Ungerman Hill, P.C., Dallas, TX, for debtor; Neal Tomlins, of Baker & Hoster, Tulsa, OK, on the briefs.

## ORDER DENYING OBJECTION TO PLAN OF REORGANIZATION BASED ON ITS METHOD OF CLASSIFYING CLAIMS

### [11 U.S.C. § 1122(a)]

RICHARD L. BOHANON, Chief Judge.

ZRM–Oklahoma Partnership, the debtor-in-possession in this case under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., has proposed a plan of reorganization. Its largest creditor, IDS Life Insurance Company, objects to confirmation on several grounds. This order concerns the first of these objections, separate classification of the deficiency claim of a first lien holder. This issue is common to many single asset chapter 11 cases.

ZRM owes IDS approximately $4,000,000 secured by a first lien on its hotel which is worth approximately $2,000,000. When IDS sought foreclosure and appointment of a receiver in state court ZRM filed its chapter 11 petition. In addition to the IDS debt ZRM owes some $65,000 to 98 trade creditors.

The proposed plan of reorganization places the trade debt in a class by itself and IDS' deficiency claim of some $2,000,000 in a separate class. Obviously, if IDS is in the trade class its $2,000,000 claim will dominate that class and, if it rejects the plan, debtor will not have the accepting class required for plan confirmation by section 1129(a)(10) of the Bankruptcy Code.

Under the plan the trade debt class would be paid in full over one year with the likely result that this class will accept the plan. IDS would have the option of receiving 3% of its claim on the effective date or being paid 50% of ZRM's "excess cash flow" over a period of years. Neither of these alternatives is acceptable to IDS and it contends, among other objections, that the plan is defective due to this classification scheme.

IDS claims its treatment violates section 1122(a)[1] of the Code which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." It contends this section requires that all similar claims be placed in the same class. This leads to what is a significant issue in many chapter 11 cases, particularly those having one primary asset and a dissatisfied lien holder.

## I. THE CORRECT METHOD OF STATUTORY INTERPRETATION

Unquestionably, debtor could place IDS' deficiency claim in the same class as the unsecured trade debt. The question is whether the Bankruptcy Code compels it to classify them together?

The most obvious place to begin the analysis of this dispute is with the language of § 1122(a). *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

The Supreme Court repeatedly directs use of judicial restraint in statutory interpretation. The Court admonishes that it is rarely necessary to go beyond the language of the statute itself, and that interpretation of the scope of codified law should be arrived at through guidance from the canons of statutory construction based upon a text based analysis. Under this methodology if a provision is unambig-

---

1. Section 1122 governs classification of claims or interests and provides:

(a) Except as provided in subsection (a) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

uous then the court must remain within its language. *Id.*, at 241, 109 S.Ct. at 1030. If it is ambiguous the court only then may look beyond the actual language to discern its reach.[2]

Although these directives appear clear and concise, their implementation is difficult and controversial. Some argue that such a course trivializes the role of the judiciary. They advocate a more activist role based on judicial determination of legislative intent.

■ Both methods have their own strengths and weaknesses and both can be misused to arrive at a pre-selected result. The conscientious jurist must be able to apply the appropriate procedure without lapsing into the alluring world of policy making.

The Court has fashioned an analytical approach for the lower courts to use in determining whether a body of codified law taken as a whole or a specific provision within it is ambiguous. *See Board of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986); *Ron Pair Enterprises, Inc.*, supra.

■ Under this approach one must first determine whether the code at hand is consistent and coherent. *Ron Pair Enterprises*, supra, 489 U.S. at 240, 109 S.Ct. at 1029. Following this guidance one then must determine the plain meaning of the statute at issue and next determine if it is ambiguous.

To interpret legislation one looks first to the plain language of its provisions. *See*

*Board of Governors*, supra, 474 U.S. at 373–374, 106 S.Ct. at 688–689. In developing this methodology the Court recognizes the reality of the legislative process and concludes that only rarely will outside evidence of the broad purposes underlying enactment of legislation be useful. *See Griffin v. Oceanic Contractors*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). Such an instance could be when the outcome under one statute produces results contrary to other equally important legislation. *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

Generally though, such outside evidence of Congressional intent is misleading at best, because:

Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purposes" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

---

2. Emphasis on the "plain meaning" of legislative enactments is likely another indication of the convergence of the common and civil law legal systems. The usual understanding of the civil law system is that it is based primarily on codified law with little room for judicial policy making or sweeping interpretation based on perceived legislative intent. In that system the function of the judge is strictly limited to selecting the applicable section of the code and "giving it its obvious significance in the context of the case." Merryman & Clark, *Comparative Law: Western European and Latin American Legal Systems*, p. 827 (1978).

It is stated that:
All of the national legal systems of the Western world are members of two great legal families: the Romanic civil law and the English common law. Within each family the national legal systems share certain characteristics that, despite their many dissimilarities, mark them as participants in a common legal culture. These family traits also serve to distinguish the civil law and the common law, and much of the work of comparative lawyers within each tradition consists in identifying and discussing their origins and significance. The obverse of this question is that of similarity: to what extent are the legal systems in the two great families of Western law similar? Related to that question is the more dynamic one of change: are the common law and civil law becoming more or less like each other? In a word, is there a detectable tendency toward convergence? Convergence of the civil law and common law is, accordingly, a common topic of discussion among comparative lawyers. *Id.*, at 51–52.

*Board of Governors,* supra., 474 U.S. at 373–374, 106 S.Ct. at 686–689.

As regards the Bankruptcy Code, courts need not look outside its language to discern its purpose. The Court has noted already that the Code is the result of Congressional compromises concerning the competing concerns of the various interests in a bankruptcy case. *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 61 n. 12, 102 S.Ct. 2858, 2866 n. 12, 73 L.Ed.2d 598 (1982). It has further found this series of compromises, as a whole, to be coherent and consistent and repeatedly looks to the plain meaning of its individual provisions to interpret their scope. *Ron Pair Enterprises,* supra, 489 U.S. at 240–241, 109 S.Ct. at 1029–1030.

█ After determining the purpose of specific legislation either through its plain language, or outside sources in those rare cases when they are necessary, the analysis shifts to determining the plain meaning of a statute and whether it is ambiguous. Again the Court has provided a methodology to make this determination. It states that a statute is ambiguous when its literal application produces a result "demonstrably at odds" with the legislative scheme. *Griffin,* supra, 458 U.S. at 571, 102 S.Ct. at 3250.

To determine whether a statute produces results demonstrably at odds with the legislative purposes one must again look to the plain language and determine whether application of the statute conflicts with any other section of the code in question. If the plain meaning of the statute produces results conflicting with other provisions then it is ambiguous and use of outside evidence of Congressional intent may be applicable. If it does not conflict then the statute is unambiguous and one should not look beyond its language. *See Ron Pair*

*Enterprises,* supra, 489 U.S. at 243, 109 S.Ct. at 1031.

## II. THE PLAIN MEANING OF THE STATUTE

█ With this background the analysis proceeds to the statute in question, § 1122(a). The language of this section is clear. It prohibits single classification of dissimilar claims. The plain language of this statute does not alone support any other restriction. *See Matter of Jersey Medical Center,* 817 F.2d 1055, 1060–61 (3d Cir.1987); *In re United States Truck Co., Inc.,* 800 F.2d 581, 585 (6th Cir.1986).

Some courts, though recognizing the plain meaning of § 1122 decline to apply it. *See John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assoc.,* 987 F.2d 154 (3d Cir.1993); *Matter of Lumber Exchange Building Limited Partnership,* 968 F.2d 647 (8th Cir.1992); *In re Bryson Properties, XVIII,* 961 F.2d 496 (4th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Matter of Greystone III Joint Venture,* 948 F.2d 134 (5th Cir.1991), *cert. denied* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). The reason generally provided to support this position is that a debtor should not be allowed to "gerrymander" classes in order to arrive at the one approving impaired class required to implement the § 1129(b) confirmation "cram down" provisions.[3] Underlying the reasoning of these courts is the unspoken belief that the creditor protection provided by Congress regarding plans of reorganization are inadequate. They create a policy which says that a creditor holding a large claim is not sufficiently protected unless it can veto a plan of which it disapproves.

---

**3.** Another reason given for ignoring the clear language of § 1122(a) has been to say that a plain reading of it renders § 1122(b) superfluous. *Greystone,* supra, at 138–139. To arrive at such an interpretation requires one to turn the meaning of § 1122(a) upside down. Section 1122(a) speaks *solely* to which claims may *not* be classified together, while § 1122(b) creates the one exception to that rule for dissimilar, *de minimus,* unsecured claims. *See* T.J. Meaney,

*Recent Developments—Living in Limbo: Single Asset Reorganization within the Financially Distressed Fifth Circuit: In re Greystone III Joint Venture,* 23 St. Mary's L.J. 1205, 1209 (1992); L.J. Rusch, *Single Asset Cases and Chapter 11: The Classification Quandry,* 1 ABI L.Rev. 43, 53 (1993); S. Sather & A. Overstreet, *The Single Asset Real Estate Debtor: A Selective Overview,* to be published at 2 J.Bankr.L.Prac. —— (Sept/Oct. 1993).

The obfuscation of these decisions is disconcerting. Even if a debtor purposefully classifies claims so as to form the essential accepting impaired class the proscription in § 1129(b) against discrimination and the requirement that the plan be fair and equitable, as well as the good faith requirement of § 1129(a)(3), the best interests of creditors test of § 1129(a)(7) and the recourse election of § 1111(b) still protect the creditors. The courts which misinterpret § 1122 in this manner are literally writing their own "plan veto" protection for large creditors into the Bankruptcy Code.

■ Whether one believes that the ability to confirm a plan over the objection of the holder of the undersecured claim gives the debtor too great an advantage over the creditor or not, Congress chose to grant the debtor this capability and it is not for the courts to eliminate it. Further, "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas,* — U.S. —, —, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991). Whether Congress has wisely balanced the conflicting interests at play here is not a question the judiciary is competent to decide. *Union Bank,* supra, — U.S. at —, 112 S.Ct. at 533.

### III. CONTINUITY WITH THE STATUTORY SCHEME

The Court directs that next, one determine whether the plain meaning of the statute produces a result in conflict with the remainder of the Code. *See Ron Pair Enterprises,* supra. The most relevant source in this context are those provisions limiting plan content, §§ 1123 and 1129. A non-restrictive reading of § 1122(a) does not conflict with these sections of the Code.

■ As discussed previously, the Code is the product of various compromises among competing interests in a bankruptcy case, secured creditors, unsecured creditors, equity interest holders and the debtor. In chapter 11 these compromises are visible in the plan content sections. The Court observes, under this compromise scheme,

that if a limitation or restriction is not expressly present in the plain language of the Code it was not intended. It noted early on that "in an instrument well drawn, as in a poem well composed, silence is sometimes most expressive." *Chisholm, Ex'r. v. Georgia,* 2 Dall. 419, 454, 1 L.Ed. 440 (1793). *See also Owen v. Owen,* — U.S. —, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991); *Toibb v. Radloff,* 501 U.S. —, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *Union Bank v. Wolas,* — U.S. —, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). It has refused to "create a distinction that the words of the statute do not contain." *Owen,* supra, — U.S. at —, 111 S.Ct. at 1838.

The compromise scheme results in tension between these sometimes conflicting interests. Existence of this tension does not require the conclusion that a provision does not mean what it says. *Ron Pair Enterprises,* supra, 489 U.S. at 245, 109 S.Ct. at 1032.

Section 1122(a) complements this compromise system by allowing a wide range of possible classifications limited by other explicit protection mechanisms in the Code which Congress agreed to in sections 1111, 1123, and 1129.

Further, such an interpretation of § 1122(a) is supported by the broad grant of authority given the reorganizing entity through § 1123(b)(5). This statute says that a plan "may include any other appropriate provision not inconsistent with the applicable provisions of this title." Congress plainly fashioned a broad classification scheme, subject only to limitations contained elsewhere in the Code.

Accordingly, this non-restrictive interpretation of § 1122(a) does not conflict with other provisions of the Bankruptcy Code.

### IV. CONCLUSION

Following this methodology it appears (1) that the Bankruptcy Code is consistent and coherent; (2) that the plain language of § 1122(a) does not conflict with the Code;

and (3) that there is no reason to resort to outside sources in interpreting the section.

The Congressional compromises which resulted in the present structure of the Bankruptcy Code are evident in chapter 11. Whether one agrees with it or not the language of § 1122(a) is unambiguous. Under a plain reading of its language the section is in harmony with the remainder of the Code, especially the flexibility provided by § 1123(b)(5) when taken in connection with the offsetting structure of the creditor protection provided elsewhere in chapter 11.

Therefore, debtor's classification of the unsecured deficiency claim of IDS Life Insurance separately from all other unsecured claims is allowed under the Bankruptcy Code.

Accordingly, IDS' objection to the plan based on classification is denied.