**In re CITY OF COLORADO SPRINGS SPRING CREEK GENERAL IM-PROVEMENT DISTRICT, Debtor.**

**Bankruptcy No. 94–15333 MSK.**

United States Bankruptcy Court,
D. Colorado.

Sept. 29, 1995.

Nunc pro tunc Sept. 20, 1995.

Patricia K. Kelly, Office of the City Attorney, Colorado Springs, Colorado, James B. Holden, Holden & Jessop, P.C., Denver, Colorado, for Debtor.

James S. Bailey, Jr., Bailey, Harring & Peterson, P.C., Denver, Colorado, for Colorado BondShares.

Virginia Anne Housum, Dorsey & Whitney, Denver, Colorado, for Indenture Trustee, Colorado National Bank.

## MEMORANDUM OPINION AND ORDER CONFIRMING SECOND AMENDED PLAN FOR ADJUSTMENT OF DEBTS

MARCIA S. KRIEGER, Bankruptcy Judge.

THIS MATTER comes on for confirmation of the Second Amended Plan for Adjustment of Debts dated April 10, 1995 filed by the City of Colorado Springs Spring Creek General Improvement District (District). Colorado BondShares objects to confirmation. Having heard the arguments of counsel, reviewed the pleadings and received evidence in open court and for the reasons set forth below, the Court finds that all requirements for confirmation set forth in 11 U.S.C. § 943 are satisfied and confirms the Second Amended Plan for Adjustment of Debts.

## I. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). On September 8, 1994, this Court ruled that the District was a municipality eligible to adjust its debts under Chapter 9 of the Bankruptcy Code. An Order of Relief was entered on September 15, 1994.

## II. BACKGROUND FACTS

The District is a general improvement district organized in 1985 pursuant to Colorado law, specifically C.R.S. § 31–25–601, *et seq.* The District is comprised of approximately 454 acres of partially developed land located in Colorado Springs, Colorado. In 1987, in order to fund improvements associated with development, the District issued a series of general obligation bonds in the principal amount of $5,355,000. The bonds have maturity dates ranging from 1994 through 2006.

To assure repayment of the bonds, the District entered into a trust agreement (Trust Agreement) with Colorado National Bank Exchange serving as Trustee. Under the Trust Agreement, the District conveyed all of its interest and rights under a certain letter of credit (Letter of Credit) to the Trustee. The Trustee was authorized to draw upon the Letter of Credit to pay bond principal and interest as such came due. The Trustee has fully drawn upon the Letter of Credit and now holds its proceeds.

In late 1993, the District anticipated that the proceeds of the Letter of Credit would be exhausted and the real estate tax assessments would be increased substantially in order to pay bond interest and principal. The District negotiated with property owners and some bondholders to restructure the bond indebtedness, which negotiations generated a proposed plan of adjustment, acceptable to a portion of the bondholders.

Initially, this case was filed as a prepackaged Chapter 9 case. By oral Order of October 24, 1994,* this Court denied confirmation of the prepackaged First Amended

Plan for Adjustment of Debts. The District then filed its Second Amended Plan for Adjustment of Debts (Plan). The Disclosure Statement was approved and votes solicited.

The Plan contains three classes of allowed claims of bondholders (Bond Claims) which are classified by the maturity date of the bond. Class I is comprised of Bond Claims for bonds with maturity dates of December 1, 1994, 1995 and 1996. Class II is comprised of the Bond Claims for bonds with the maturity date of December 1, 1997. Class III is comprised of the Bond Claims for bonds with the maturity date of December 1, 2006.

Under the Plan, Class I Bond Claims will be paid the principal amount of each bond in 1995 from the Letter of Credit proceeds currently held by the Trustee. Bonds held by claimants in Classes II and III will be exchanged for new bonds (Plan Bonds). Class II Plan Bonds will be paid through a mandatory lottery process. Holders of Class II Plan Bonds will receive 3% interest from December 1, 1994 until the date of repayment. Class III Plan Bonds will mature and be paid on December 1, 2014. The Plan eliminates all call premiums, removes the prohibition of early redemption for the bonds maturing on December 1 of years 1996 and 1997, and by implication modifies the terms of the Trust Agreement to make it consistent with the terms of the restructured indebtedness.

All classes have voted to accept the Plan. Indeed, only one bondholder, Colorado BondShares, has rejected the Plan. Colorado BondShares holds 4% of the Bond Claims and 23% of the indebtedness of Class III.

The confirmation hearing was held on August 8, 1995. Proper notice was given by the District in accordance with Fed.R.Bankr.P. 2002(b)(2). At the hearing, the District proffered evidence in satisfaction of all requirements for confirmation under 11 U.S.C. § 943, except the requirement contained in § 943(b)(3). The Court granted the District 10 days to supplement its earlier disclosure of the time and billing records for the ser-

---

* The original Memorandum Opinion and Order dated September 20, 1995 incorrectly referred to the date of the Order denying confirmation of the

First Amended Plan as January 31, 1995. Such date was the date of the subsequent written opinion published at the request of the parties.

vices and expenses incurred in the case or incident to the Plan which are to be paid by the District. The supplementation was timely filed. The Court finds that the fees and expenses have been fully disclosed and are reasonable.

## III. ANALYSIS

A bankruptcy court is required to confirm a plan of adjustment of debts proposed under Chapter 9 if the requirements of 11 U.S.C. § 943(b) are satisfied. These requirements are:

(1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;

(2) the plan complies with the provisions of this chapter;

(3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

(4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(1) of this title will receive on account of such claim cash equal to the allowed amount of such claim;

(6) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(7) the plan is in the best interests of creditors and is feasible.

There is no dispute that the requirements of subsections (3) through (7) are satisfied. Colorado BondShares' objections arise under subsections (1) and (2). Colorado Bond-

Shares objects to confirmation on grounds that (1) the Plan impermissibly classifies the Bond Claims in violation of the requirements of 11 U.S.C. § 1122(a) and (2) the Plan impermissibly modifies the contractual terms contained in the Trust Agreement and/or Letter of Credit.

### A. Does the Plan Impermissibly Classify Bond Claims in Violation of the Provisions of 11 U.S.C. § 1122(a)?

Colorado BondShares argues that all Bond Claims are substantially similar and that no distinction can be made based upon the maturity date of the bonds. Therefore under the terms of 11 U.S.C. § 1122(a), Colorado BondShares contends that the Bond Claims in Class III cannot be classified separately or receive different treatment from claims in Classes I and II.[1]

The District responds with several arguments. First, it contends that Colorado BondShares is not really complaining about classification of the Bond Claims, but instead that the Plan's treatment of Class III is unfairly discriminatory. Because all classes have accepted the Plan and the cramdown provisions of 11 U.S.C. § 1129(b) are not invoked, the District argues that Colorado BondShares' classification argument is barred. Second, to determine whether the classification of Bond Claims is unfairly discriminatory, the District argues that the Court should employ the four-part test adopted in *In re Davidson,* 72 B.R. 384 (Bankr.D.Colo.1987). Finally, the District argues that the case law relied upon by Colorado BondShares is not applicable.

While these arguments are persuasively made and have some merit, none directly addresses the fundamental issue: Can similar claims be classified separately and treated differently under a Chapter 9 plan of adjustment?

None of the case authority relied upon by the parties is dispositive. The pre-Code case of *Scherk v. Newton (In re Rocky Mountain Fuel Co.),* 152 F.2d 747 (10th Cir.1945) relied

---

**1.** Colorado BondShares argues that all Bond Claims are secured claims. While the Court has concerns as to whether such claims are truly secured under the Trust Agreement and Colorado law, such argument need not be addressed because the parties do not contest that all Bond Claims are similarly situated in this regard.

upon by Colorado BondShares, is not applicable because it interprets the classification requirements of the Bankruptcy Act which differ from the wording and purpose of 11 U.S.C. § 1122.[2] Colorado BondShares also relies upon *Sanitary and Improvement Dist. 65 v. First Nat'l Bank of Aurora,* 79 B.R. 877 (D.Neb.1987). While *Sanitary Improvement* addresses classification issues in a Chapter 9 case, its analysis is not helpful because it starts from the presumption that claims must be different in order to be classified separately. The District relies upon *Davidson,* a Chapter 13 case, which is not applicable because it interprets § 1322 rather than § 1122. Section 1322 incorporates § 1122 by reference but includes an additional requirement that classification under a Chapter 13 plan "may not discriminate unfairly against any class so designated".

█ The starting place for analysis of this issue is 11 U.S.C. § 943(b)(1) which requires a plan of adjustment to comply with the provisions of § 901. Section 901(a) incorporates numerous Code provisions including § 1122 and § 1129(a)(2), (3), (6), (8), (10) and (b)(1), (2)(A) and (B). Through this linkage the claim classification provisions of § 1122 and certain plan confirmation standards under § 1129 are incorporated into Chapter 9.

Generally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case. It provides:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The express language of § 1122(a) imposes only one requirement—that claims in a given class be substantially similar to each other. There is no requirement that all substantially similar claims be placed in the same class nor is there a prohibition against classifying substantially similar claims separately. Almost all courts interpreting § 1122(a) recognize that it does not prohibit separate classification of similar claims, yet many courts, including seven Circuit Courts of Appeal, have augmented § 1122(a) to impose restrictions on a plan proponent's ability to separate similar claims.[3]

█ When objections to classification under § 1122(a) arise, courts are usually presented with allegations that the plan proponent separately classified similar claims only

---

**2.** Under the Bankruptcy Act, classification in Chapters X and XII was governed by Sections 197 and 452, respectively. In pertinent part, those sections read: "Sec. 197. For the purposes of the plan and its acceptance, the judge shall fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock." "Sec. 452. For the purposes of the arrangement and its acceptance, the court may fix the division of creditors into classes according to the nature of their respective claims." The purpose of claim classification under both sections was different than it is under § 1122. In Chapter X, voting rights were less important than they are in Chapter 11 or Chapter 9 because any creditor could invoke the absolute priority rule (Bankruptcy Act of 1898 § 206, 11 U.S.C. § 606 (1976) (repealed)). Thus, no creditor faced a significant risk that the majority of a creditor class would bind the creditor to a plan which provided less than full recovery and payment of junior classes. Because the focus of Chapter XII was the modification of rights of secured creditors, classification was less important than was valuation. Indeed, a Chapter

XII plan could ignore the unsecured creditors entirely.

**3.** The Second, Third, Fourth, Fifth, Sixth, Eighth and Eleventh Circuit Courts of Appeal have imposed such restrictions. *See, e.g., Boston Post Road Ltd. Partnership v. F.D.I.C. (In re Post Road Ltd. Partnership),* 21 F.3d 477, 483 (2nd Cir. 1994); *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc.,* 987 F.2d 154, 159–60 (3d Cir.1993); *Lumber Exch. Bldg. Ltd. Partnership v. Mutual Life Ins. Co. (In re Lumber Exch. Bldg. Ltd. Partnership),* 968 F.2d 647, 649 (8th Cir.1992); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 502 (4th Cir.1992); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture),* 995 F.2d 1274, 1278–1279 (5th Cir.1991); *Olympia & York Florida Equity Corp. v. Bank of N.Y. (In re Hollywell Corp.),* 913 F.2d 873, 880 (11th Cir.1990); *Teamsters Nat'l Freight Indus. Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.),* 800 F.2d 581, 586 (6th Cir.1986).

to ensure acceptance by at least one class of impaired claims as required by § 1129(a)(10). Such manipulation is viewed as an abuse of Chapter 11. In the oft cited case of *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture)*, 995 F.2d 1274 (5th Cir.1991), the Fifth Circuit held that "one clear rule" has emerged from the otherwise muddled § 1122 case law: "[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan". *Greystone*, 995 F.2d at 1279. To justify restrictions upon a plan proponent's ability to classify similar claims, the Court reasoned that the provisions of § 1122(b) would be superfluous if § 1122(a) were broadly interpreted.

Other courts have followed suit, candidly acknowledging that while a restriction on classification of similar claims is not expressly embodied in § 1122(a) it should be implied based upon basic concepts of fairness and in order to preserve the balance of power among creditors in a Chapter 11 case. "Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class." *Teamsters National Freight Indus. Negotiating Committee v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 586 (6th Cir.1986). This rationale was adopted by the Third Circuit. "There must be some limit on the debtor's power to classify creditors.... [T]he potential for abuse would be significant otherwise." *John Hancock*, 987 F.2d at 158 quoting *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th

Cir.1986). In agreement, the Fourth Circuit held, "[A]lthough separate classification of similar claims may not be prohibited, it may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims". *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 502 (4th Cir.1992). The Second Circuit held that, "Separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classifications of similar claims". *Boston Post Road Ltd. Partnership v. F.D.I.C. (In re Boston Post Road Ltd. Partnership)*, 21 F.3d 477, 483 (2nd Cir.1994).

Unfortunately, the narrow concern that classification of similar claims not be used to gerrymander voting has blossomed into a line of authority in which plan proponents routinely are required to justify separate classification of similar claims or such classification is forbidden regardless of whether gerrymandering is an issue.[4] In short, judicial interpretation of § 1122(a) to avoid gerrymandering has resulted in a rewriting of the section. Most courts now either forbid separate classification of similar claims or require a plan proponent to justify separate classification.

The Tenth Circuit Court of Appeals has not yet explored the meaning of § 1122. However, within the circuit, there is a split of interpretation at the bankruptcy court level. Decisions in *In re Dean*, 166 B.R. 949 (Bankr.D.N.M.1994), *In re Stratford Associ-*

---

4. See, e.g., *Matter of Woodbrook Associates*, 19 F.3d 312 (7th Cir.1994); *Heartland Federal Savings & Loan Assn. v. Briscoe Enterprises, Ltd., II (Matter of Briscoe Enterprises, Ltd., II)*, 994 F.2d 1160 (5th Cir.1993); *Bustop Shelters of Louisville, Inc. v. Classic Homes Inc.*, 914 F.2d 810 (6th Cir.1990); *Olympia & York Florida Equity Corp. v. Bank of N.Y. (In re Hollywell Corp.)*, 913 F.2d 873 (11th Cir.1990); *Hanson v. First Bank of South Dakota*, 828 F.2d 1310 (8th Cir.1987); *Matter of Jersey City Medical Center*, 817 F.2d 1055 (3rd Cir.1987); *In re D & W Realty Corp.*, 165 B.R. 127 (S.D.N.Y.1994); *In re One Times Square Associates Ltd. Partnership*, 165 B.R. 773 (S.D.N.Y.1994); *In re Fairfield Executive Associates*, 161 B.R. 595 (D.N.J.1993); *In re Thorn-*

*wood Associates*, 162 B.R. 438 (M.D.Pa.1993); *In re 266 Washington Associates*, 147 B.R. 827 (E.D.N.Y.1992); *Piedmont Associates v. Cigna Property & Casualty Ins.*, 132 B.R. 75 (N.D.Ga. 1991); *Sanitary and Improvement Dist. 65 v. First Nat'l Bank of Aurora*, 79 B.R. 877 (D.Neb.1987); *In re Austin Ocala Ltd.*, 152 B.R. 773 (Bankr. M.D.Fla.1993); *In re Roswell–Hannover Joint Venture*, 149 B.R. 1014 (Bankr.N.D.Ga.1992); *In re Main Road Properties, Inc.*, 144 B.R. 217 (Bankr.D.R.I.1992); *In re Valrico Square Ltd. Partnership*, 113 B.R. 794 (Bankr.S.D.Fla.1990); *In re Waterways Barge Partnership*, 104 B.R. 776 (Bankr.N.D.Miss.1989); *In re Meadow Glen, Ltd.*, 87 B.R. 421 (Bankr.W.D.Tex.1988).

*ates Ltd. Partnership,* 145 B.R. 689 (Bankr. D.Kan.1992) and *Sanitary Improvement, supra,* require a plan proponent to justify separate classification of similar claims. However, Judge Richard Bohanon, Chief Judge of the Bankruptcy Court for the Western District of Oklahoma, rejects the majority view and strictly interprets § 1122(a) in *In re ZRM–Oklahoma Partnership,* 156 B.R. 67 (Bankr.W.D.Okla.1993).[5]

Despite my respect for the reasoning of other courts, I cannot adopt the majority view for three reasons. First, I agree with Judge Bohanon's analysis in *ZRM* that the language of § 1122(a) is plain and unambiguous. In the absence of clear congressional intent to the contrary, § 1122(a) must be applied, not interpreted or modified. The statutory construction analysis in *Greystone* linking the provisions of § 1122(a) and (b) is unpersuasive. Subsection 1122(b) has a plain meaning without rewriting § 1122(a). As Judge Bohanon points out:

> To arrive at such an interpretation requires one to turn the meaning of § 1122(a) upside down. Section 1122(a) speaks solely to which claims may not be classified together, while § 1122(b) creates the one exception to that rule for dissimilar, *de minimis* unsecured claims.

156 B.R. at 70 n. 3.

The fundamental presumption of statutory construction that Congress intended to say what it says and only what it says is further supported by comparing the provisions of § 1122 with § 1322. In § 1322(b)(1), Congress authorized Chapter 13 debtors to classify claims as provided in § 1122 but added the restrictive language "but may not discriminate unfairly against any class so designated". Had Congress intended § 1122(a) to contain a requirement that no class be unfairly discriminated against, the language of § 1122(a) and § 1322(b)(1) would have been identical.

■ Second, despite legitimate concerns about gerrymandering of classes for voting purposes, it is not necessary to rewrite

§ 1122(a) to prevent such abuse. Section 1122 is concerned with what claims belong in a class. Gerrymandering is an issue arising from the relationship among classes which is governed by § 1129. For instance, § 1129 specifies the treatment for administrative expense claims, tax claims, retirement benefits and for payment of required fees. Most importantly, § 1129(b) creates minimal standards for treatment of impaired classes which do not accept the plan. These are known as the cramdown requirements.

I agree with the reasoning of Bankruptcy Judge John C. Ryan of the Central District of California in *Principal Mut. Life Ins. Co. v. Baldwin Park Towne Center, Ltd. (In re Baldwin Park Towne Center, Ltd.),* 171 B.R. 374 (Bankr.C.D.Calif.1994). Issues of gerrymandering can and should be addressed as part of the "unfair discrimination" analysis of § 1129(b). If the plan proponent artificially creates a class of claims solely to obtain the affirmative vote of an impaired class as required by § 1129(a)(10), the cramdown analysis will necessarily be invoked. To allow a cramdown a court must find that the plan does not discriminate unfairly. Gerrymandering or disparate treatment of classes of similar claims falls squarely within the concept of unfair discrimination. Judge Ryan concludes:

> To summarize, the Code presently has adequate means for addressing the "fairness" issues when an impaired class rejects its treatment under a plan. Courts need not do injustice to the statutory language of the Code by imposing on a debtor additional obligations that are not contained in § 1129 [sic].

*Baldwin Park,* 171 B.R. at 378.

Finally, rewriting § 1122(a) to restrict a plan proponent's ability to classify similar claims is too blunt an instrument to address gerrymandering problems. Such restrictions are inappropriate when gerrymandering is not an issue. This is just such a case.

**5.** Rejection of the majority rule has occurred at the bankruptcy court level in other jurisdictions. *See In re SM 104 Ltd.,* 160 B.R. 202, 216–221 (Bankr.S.D.Fla.1993); *Principal Mut. Life Ins. Co. v. Baldwin Park Towne Center, Ltd. (In re Baldwin Park Towne Center, Ltd.),* 171 B.R. 374, 377 (Bankr.C.D.Calif.1994).

▮ Colorado BondShares has not argued that the Plan's class structure was gerrymandered to create an accepting, impaired class. All classes have voted to accept the Plan. Colorado BondShares' real argument is that it doesn't like treatment of its claim (deferral of payment until December 1, 2014) or the use of the Letter of Credit proceeds to retire claims in Class I. Thus, Colorado BondShares' argument is not whether Class III has been properly composed (§ 1122), but instead whether it has been fairly treated (§ 1129(b)). Because Colorado BondShares does not contend that its claim is dissimilar to other claims in Class III, § 1122(a) is inapplicable. Because all classes have accepted the Plan, the unfair discrimination analysis of § 1129(b) does not apply.

▮ Colorado BondShares is simply a dissenting creditor in an accepting class. Were this a Chapter 11 case, Colorado BondShares would be protected by the best interest test of § 1129(a)(7). However, Chapter 9 does not incorporate the provisions of § 1129(a)(7) through § 901(a). In adopting the Code, Congress deleted a provision of the 1976 amendment to the Bankruptcy Act which required a Chapter 9 plan to be "fair and equitable" and "not discriminate unfairly in favor of any creditor or class of creditors". 11 U.S.C. § 414(b) (1976) (repealed). The only requirement of § 943(b) which resembles the earlier language is that the plan be "in the best interest of creditors", but this is not the same requirement found in § 1129(a)(7)(A) or the 1976 Act. In Chapter 9, dissenting creditors in an accepting class are bound by the accepting vote of the other members.

In summary, there is no requirement in § 1122 that similar claims be classified together. Therefore, it does not matter whether the Bond Claims of Class III are similar to Bond Claims in other classes. Despite its dissenting vote, Colorado BondShares is bound by the acceptance of the Plan by Class III.

**B. Does the Plan Impermissibly Modify the Contractual Terms Contained in the Trust Agreement or Letter of Credit?**

Colorado BondShares argues that the Plan impermissibly modifies the contractual terms of the Trust Agreement and the terms of the Letter of Credit by using the Letter of Credit proceeds to pay only Class I Bond Claims. At the heart of its argument, is Colorado BondShares' contention that all bondholders are secured creditors holding undivided interests in the proceeds of the Letter of Credit. Colorado BondShares argues that the proceeds of the Letter of Credit must be divided among holders of all Bond Claims on a *pro rata* basis.

The District responds that the Letter of Credit was extinguished at the time of the Trustee's last draw, thus its terms are not an issue. Further, it contends that because the Plan provides that such proceeds will be used to pay Class I claimants and that claimants in Class II and Class III will receive Plan Bonds, the Trust Agreement will be extinguished. The District finally argues that because all classes of bondholders have accepted the Plan and the Trustee has expressly consented to the Plan, modification of the Trust Agreement is essentially a moot issue.

The Trustee argues that to the extent that the terms of the Trust Agreement are modified by restructuring of the bond indebtedness, such modification falls squarely within the spirit and provisions of the Code. Although the Trustee did not vote on the Plan,[6] it has expressly accepted and agreed to be bound by the terms of the Plan and requests a determination that confirmation of the Plan amends the Trust Agreement.

With regard to this objection, the parties agree on several key facts. Because all funds have been drawn by the Trustee, the Letter of Credit is not the subject of any modification by the Plan. The Trust Agreement is a vehicle intended to assure repayment of the bond indebtedness; it is a contract between the District and the Trustee to which the bondholders are third-party bene-

---

**6.** The Trustee contends that it lacks standing to vote on behalf of the bondholders. 11 U.S.C. § 1126; 5 COLLIER ON BANKRUPTCY ¶ 1126.03 (15th ed. 1995); *Kroeschell v. Brittain (In re Kenilworth Bldg. Corp.),* 105 F.2d 673 (7th Cir.1939).

ficiaries.[7] The Trust Agreement may not be modified unilaterally by the District. Any amendment requires the consent of the Trustee.[8] In addition, the Court finds that at the time of the filing of this case the District had unmatured, contingent obligations under the Trust Agreement.[9]

■ The Plan does not expressly modify the Trust Agreement but the restructuring of the bond indebtedness and use of the Letter of Credit proceeds to pay Class I claimants are inconsistent with its terms. If the Letter of Credit proceeds are used to pay Class I claimants and new Plan Bonds are issued to holders of Bond Claims in Classes II and III, the Trust Agreement becomes meaningless. Thus by implication, the Plan modifies and extinguishes obligations of both the District and Trustee under the Trust Agreement. Although this issue might have been avoided by an express provision in the Plan dealing with the Trust Agreement and an affirmative vote by the Trustee, such omissions do not preclude modification of the Trust Agreement through confirmation of the Plan.

■ In this context it is useful to recall that the purpose of Chapter 9 is,

> to permit a financially distressed public entity to seek protection from its creditors while it formulates and negotiates a plan of adjustment of its debts, either extending maturities, reducing interest or principal, or refinancing its debt by obtaining a new loan elsewhere to pay off existing debt, in

whole or in part, and to provide a mechanism by which the plan that is to be acceptable to the majority of creditors can be made binding on a recalcitrant and dissenting minority.

4 COLLIER ON BANKRUPTCY ¶ 900.02 (15th ed. 1995). This purpose is consistent with the constitutional authority of bankruptcy courts to impair contractual obligations. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935); *Brockett v. Winkle Terra Cotta Co.,* 81 F.2d 949 (8th Cir.1936). The Plan's modification of the Trust Agreement is consistent with this purpose and the technical provisions of the Code. Moreover, as a practical matter modification of the Trust Agreement is necessary to restructure the District's bond indebtedness.

■ Chapter 9 expressly requires a plan for the adjustment of debts. 11 U.S.C. § 941. The general definitions found in § 101 are not incorporated in Chapter 9 by reference under § 901(a). The term "debt" is not specifically defined in Chapter 9, but § 901(b) provides that a term used in an incorporated section of the Code will have the meaning used in such applicable section. The incorporated sections of the Code include many references to "debt".[10] Because no contrary definition for "debt" is apparent in Chapter 9, I conclude that the standard definition found in § 101 applies.

■ A debt is defined as a liability on a claim. 11 U.S.C. § 101(12). A claim, in

---

7. Section 15 of the Agreement provides:

In addition, this Trust Agreement shall constitute a third party beneficiary contract for the benefit of the owners of the outstanding bonds. Said third party beneficiaries shall be entitled to enforce performance and observance by the District and the Trustee of the respective agreements and covenants herein contained as fully and completely as if such third party beneficiaries were parties thereto.

8. Section 14 of the Trust Agreement provides:

This Trust Agreement is made by the District for the benefit of the registered owners of the outstanding bonds and is not revokable by the District, and the Letter of Credit and amounts held in the funds established hereunder and all income therefrom shall be irrevocably applied in accordance with this Trust Agreement. This Trust Agreement may be amended by a written

instrument executed by the parties hereto provided that the Trustee determines that such amendment is not materially prejudicial to the owners of bonds then outstanding or that such amendment is required to maintain exemption from federal income taxation for the interest on the bonds.

9. For example, Section 3, *"Bond Fund,"* obligates the District to deposit money to the bond fund prior to each interest payment date. Section 5, *"Collateral Fund,"* requires the District to deposit all amounts it receives pursuant to the assessment lien agreement to the bond fund for payment of the annual interest payment on the bonds. Section 12 obligates the District to pay the Trustee for services rendered.

10. For example, §§ 301, 349, 350, 361, 362, 364, 365, 366, 502, 524, 547, 548, 550, 553.

turn, is defined as a right to payment or equitable remedy for breach of performance whether or not such right is reduced to judgment, fixed, contingent, unmatured, disputed, undisputed, secured or unsecured at the time the case is filed. 11 U.S.C. § 101(5). From a technical perspective, the District's unperformed obligations under the Trust Agreement give rise to claims. In this case there are also postpetition claims which the Trustee asserted against the District in Adversary Proceeding No. 94–1625 DEC which was dismissed for lack of jurisdiction.

In Chapter 11 and Chapter 9 cases, claims are routinely restructured. Indeed, § 1123(a)(5)(F) provides that a plan shall "provide adequate means for the plan's implementation, such as—cancellation or modification of any indenture or similar instrument". The Trust Agreement not only gives rise to claims, it is a "similar instrument" which must be restructured along with the indebtedness.

From a practical perspective, the Trust Agreement is an essential component of the overall bond indebtedness being restructured under the Plan. To separate the terms of the Trust Agreement from the bond indebtedness and to hold that the bond terms can be restructured but the Trust Agreement cannot, would create an anomalous and impractical result. Such a conclusion would be similar to restructuring of the terms of a note while leaving the security agreement unaffected. The only practical and logically sound interpretation of the Plan is that it amends both the District's bond indebtedness and those contracts which assure bond repayment.

Finally, under the terms of the Trust Agreement the Trustee and the District have power to modify its terms by agreement. Colorado BondShares states no grounds upon which it could object to this modification if approved by both the District and Trustee outside of bankruptcy. Chapter 9 gives Colorado BondShares no greater rights. Though Colorado BondShares disagrees with the modification of the Trust Agreement, it is bound both by the consent of the Trustee and by the accepting vote of Class III.

For the foregoing reasons,

**IT IS ORDERED, ADJUDGED AND DECREED** that:

1. The objections of Colorado Bond-Shares are **OVERRULED.**

2. The Plan is **CONFIRMED.**

3. The District, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and all creditors, bondholders and the Trustee are bound by the provisions of the Plan.

4. The District shall, within **15 days** of the entry of this Order, serve notice of this Order on all parties in interest pursuant to Fed.R.Bankr.P. 2002(f) and file a Certificate of Service with the Court evidencing such compliance.

5. The debts of the District are discharged to the extent provided by 11 U.S.C. § 944.

6. Pursuant to 11 U.S.C. § 945(b), the District shall file a final report within **15 days** after completion of plan administration.